USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1950 JEAN M. RANDLETT, Plaintiff, Appellant, v. DONNA E. SHALALA, SECRETARY, DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ____________________ Before Boudin, Circuit Judge, Aldrich, Senior Circuit Judge, and Lynch, Circuit Judge. ____________________ Robert Le Roux Hernandez for appellant. Lori  J.  Holik,  Assistant  United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for the United States. ____________________ July 10, 1997 ____________________ BOUDIN, Circuit Judge. This appeal brings to the court the  most  recent chapter in a 20-year quarrel between a federal department  and  its  former employee, Jean Randlett. It presents an  important  legal  issue  concerning the reach of the protection afforded by Title VII of the Civil Rights Act of 1964, 42 U.S.C. S 2000e et seq. We hold that Title VII can offer protection against a retaliatory refusal to transfer an employee, but that no evidence existed here to show retaliation. I. Because Randlett's claims were resolved against her on summary judgment, we state the facts in the light most favorable  to  her.   Sargen t v. Tenaska, Inc., 108 F.3d 5, 6 (1st Cir. 1997). In 1975, Randlett worked in Denver in the Office of Civil Rights of the Department of Health, Education and Welfare  as  an  equal  opportunity specialist with a civil service grade of GS-12. She applied for a promotion to a GS-13 position  in  Denver  but  was denied promotion in favor of another candidate. A few months later, in August 1975, she was terminated.  Randlett filed a complaint with the Equal Employment Opportunity  Commission,  alleging discrimination based on gender and national origin (she is white and of European descent). Six  years  later, the EEOC ruled in her favor, finding that the record showed "[n]o other credible reason for [her] -2- -2- nonselection . . . other than the fact that the selecting official wanted to insure that the Hispanic male was awarded the GS-13 position." It found that Randlett's discharge was similarly motivated by discriminatory animus. In particular, the EEOC found that the official who considered Randlett's promotion  had applied pressure on the selecting panel to alter its  rankings, which favored Randlett, so that the job could go instead to a friend of the selecting official. The EEOC's 1981 order directed the Department, now metamorphosed  into  Health and Human Services ("HHS"), to cancel Randlett's 1975 discharge and to "immediately reinstate" Randlett in the Denver office as an equal opportunity specialist,  grade GS-13. The order also awarded Randlett back pay and other entitlements for the period since her termination,  and  it  required HHS to report within 30 days as to the  steps  it  planned to take to implement the required action. In late June 1981, Randlett began what would be an extensive exchange of telephone calls and correspondence, primarily with Thomas Jefferson, an HHS official based in Washington,  D.C., who was apparently charged with coordinating Randlett's reinstatement. She also talked with Patricia Taphorn, a personnel official in the Denver office. The upshot,  according to Randlett, was an agreement that she would return  to  the payroll of the HHS Denver office as of August 9, -3- -3- 1981, but by using four weeks of accumulated leave, would not actually report for work until early September 1981. According  to  both  Randlett and Taphorn, Jefferson was very difficult to reach over the course of the summer and did not act quickly enough to confirm this understanding, nor would anyone else in the Washington office take responsibility for doing  so.   We  pass  over  the details, but there is no indication that  anything other than bureaucratic sloth was the cause. In any  event,  in August 1981, Randlett signed a contract with her then-current employer, the Barnstable, Massachusetts, school system,  extending her employment there for an additional year. Not long afterwards, Randlett received a letter from Jefferson, confirming that she was reinstated in the Denver office as of September 1981; he also referred to the possibility  of a transfer to another regional office, but said that this was not certain. Further telephone calls were exchanged,  and  the  matter was still unresolved in October 1981, when Randlett's father became seriously ill. Randlett then told  Jefferson that she would need to stay in Massachusetts to care for her father. After  further  confusion,  Randlett in February 1982 secured from  another  HHS  official in Washington a temporary "detail" to a Boston HHS office, effective March 1, 1982, for a period of not more than 120 days. The official--Betty Lou Dotson, director of the Office for Civil Rights--wrote Randlett that -4- -4- the  detail  was  "granted  to accommodate your personal situation" and  concluded  by  saying  that "I trust this detail will give you the opportunity to attend to your personal responsibilities." Randlett resigned from her schoolteaching position and began  working  in  the  Boston HHS office in March 1982. By then, her  father  had  died,  but  her aging mother's health was failing. Randlett also claims that, almost immediately, she began to experience problems in the Boston HHS office because of inadequate training on work assignments, that she received a "low satisfactory" ranking in an evaluation, and that she was listed  at  a  GS-12  level  in Boston (even though she continued to receive a GS-13 salary).  According to Randlett, Jefferson called her in May 1982 and asked her when she planned to return to Denver. Randlett replied  that  she thought her position in Boston was permanent, but in June 1982, she sent a letter to HHS in Washington, requesting  a  permanent assignment to the Boston office, saying "this  is  an  unusual request, but probably no more unusual than the six and a half years of injustices" that she had endured. It appears that Randlett also had a telephone conversation on the subject with Bart Crivella, Jefferson's supervisor. In  early  July  1982,  the  request was answered in writing by Nathan Dick, the deputy director of the Office for Civil Rights. Dick's letter denied the transfer request but said that HHS was willing to extend the temporary detail in Boston -5- -5- until  September  30,  1982, with Randlett returning on October 1, 1982, to her "permanent duty station in Denver." The letter explained: [I]t  is  not  possible for the Office for Civil Rights to  offer  you  a permanent assignment in Boston. Your requested  assignment and subsequent detail to Boston was  a  temporary action taken only to accommodate you during  the  adjustment period after the death of your father. . . . However, the recent RIF actions in the  regions  and the continuing ceiling and budgetary constraints have eliminated practically any potential  options for this office [in Washington] to assign you to the Boston office on a permanent basis. In September, Randlett received another letter from Dick requesting  her  to  report  for work in Denver on October 1, 1982. Randlett  then  filed  a  complaint with the EEO officer in Boston, alleging  that  Washington  officials were retaliating against her "for having filed a previous complaint in Denver . . . which was resolved in my favor." Randlett's new complaint named as the  persons  who had retaliated against her Jefferson, Dick and Crivella. Instead  of  reporting  to  work in Denver on October 1, 1982, Randlett arranged to use accrued leave credits to stay in Boston for the remainder of the year. In November 1982, Randlett's prospective supervisor in Denver, Alex Aguilar, confirmed  the request for leave from October 1 to December 31, 1982; but the letter also said that Aguilar expected Randlett to report for work on January 3, 1983, and that he would -6- -6- consider  any  request for further leave to be "unreasonable and not in the best interests of our organization."  Randlett then asked Aguilar for leave-without-pay status after December 1982. Aguilar refused, saying that Randlett's "prolonged" absence was detrimental to his office. Randlett then  asked  for  sick  leave. Aguilar wrote that the agency might be  able  to  make  health-related accommodations for her in Denver so long as she documented her ailments; but some two weeks later Aguilar told Randlett that the documents she submitted were not adequate. In March 1983, Randlett resigned, saying that it was done involuntarily to prevent any "additional harassment" from Aguilar or "any other further retaliatory acts." Randlett's  September 1982 complaint--directed against the three named Washington officials--was originally rejected by HHS on the ground that it was untimely, but this ruling was reversed by the EEOC in 1985. Incredibly, the ensuing HHS internal investigation lasted over seven years. In August 1992, an HHS administrative law judge denied Randlett's claim of retaliation. His denial was sustained by the EEOC in November 1993. In  December  1993, Randlett filed her present complaint in the federal district court under Title VII. The core of the complaint  was  that  "[a]lthough HHS had full power and authority to  assign  plaintiff a permanent position in the Boston office, -7- -7- it unreasonably refused to do so in order ultimately to force plaintiff  to  resign."   The complaint attributed this refusal to retaliation for Randlett's successful 1975 complaint against the department, saying that hardship transfers were routinely granted to individuals with hardship requests similar to or less serious than Randlett's. Randlett  also charged that she had been given an improper "low satisfactory" performance rating and inadequate training in Boston. She asked for "[r]einstatement to her position in Boston" with back pay and benefits and reimbursement for some health insurance premiums and out-of-pocket medical expenses. She  also  sought  compensatory and punitive damages of $1 million each. After a period of discovery, HHS moved for summary judgment.   It argued that the denial of permanent transfer was not  an  adverse employment action under Title VII, and that the agency  had  made  an  effort to accommodate Randlett's requests by granting a temporary detail to Boston but that it was not required to go further. HHS also supplied the court with correspondenc e and a transcript of Randlett's testimony in the EEOC's recent investigation. Randlett  responded  with  her own version of events and also submitted  affidavits from HHS employees attesting that HHS did approve  hardship  transfers with some regularity, and suggesting that she could have been accommodated in the Boston office. -8- -8- The most dramatic affidavit was submitted by an EEOC employee who  had  previously worked in the Denver HHS office. According to  the  affiant, in the spring of 1982 he had been talking with Aguilar about a GS-13 position in the Denver office and asked if it was going to be filled permanently and if so, by whom. The affidavit continued: Alex Aguilar told me "That position [cannot] be filled  permanently until the matter of Jean Randlett is resolved, but I am going to make sure that she does not come to Denver. We are going to put a lot of pressure on her so she will not return to Denver." On June 5, 1996, the district judge issued a 29-page memorandum  and  order  granting HHS' motion for summary judgment. The decision dealt in different ways with Randlett's various claims, as will appear from our own discussion. The decision went some distance in the direction that HHS had urged in its original  motion, holding that "rejection of Randlett's request to  continue  to stay in Boston for personal reasons is not a[n] adverse action cognizable by federal law." II. A grant of summary judgment is subject to de novo review on appeal, and this includes any claim that the evidence made out a material issue of fact that precludes summary judgment. Sargent ,  108  F.3d at 6. Before addressing the central issue-- the denial of Randlett's request for a transfer to Boston--we consider  briefly, and then put to one side, certain rulings by the district court that require no extended treatment. -9- -9- In the district court, Randlett urged that she had been "promised" a permanent transfer to Boston by Jefferson. Assuming arguendo that such a "promise" might receive some special protection, the district court carefully reviewed the pertinent proffers of evidence, especially the documents exchanged between Randlett and the Washington office, and concluded that no reasonable jury could find that such a promise had been made. Without repeating the details, which are set forth in the district court's decision, we agree with this ruling. The district court also made short work of Randlett's claim that she had received inadequate training in Boston, saying  that  even if this were true, there was no evidence that it was based upon a motive to retaliate against her for her earlier complaint. "At most," the district judge ruled, "the evidence shows that the Boston assignment was an awkwardly- designed and temporary expedient to accommodate Randlett pending  her  return  to  the duty station [Denver] directed by the 1981 EEOC decision." This ruling also is well supported. The  district  court  also  rejected Randlett's claim that she was improperly listed as a GS-12 employee in Boston, saying that this was not an adverse employment action since Randlett continued  to  be  paid  at  the GS-13 level. We affirm this ruling on a narrower ground: no evidence exists that this alleged Boston-office "error" was motivated by a desire to retaliate -10- -10- against Randlett for filing a complaint seven years before against  a  different HHS office. Whether in some other case an inaccurate listing could be an adverse action under Title VII need not be pursued here.  The  central  issue is HHS' refusal to transfer Randlett to the  Boston  office. The district court said that this was "not a[n] adverse action cognizable by federal law," but it also said that not even a "scintilla of evidence" supported the claim  "that  the agency retaliated against Randlett by refusing to  provide  a  permanent transfer to Boston for hardship reasons or to extend her temporary detail." These are two different reasons, one relating to law and the other to fact. The  more  difficult  of  the two is the legal question: what types of employer actions adverse to the employee can, where improperly  motivated, give rise to a Title VII complaint. The district judge, arguably supported by references in the decisions of a few other courts, accepted HHS' argument that the refusal of a lateral transfer to another office of the agency does not rise to the level of an adverse employment action compensable under Title VII--even if done for an improper motive. The statute itself says that an employer may not "discriminate" against an employee or applicant "because [the employee  or  applicant] has made a charge . . . or participated in  any  manner" in a Title VII investigation or proceeding. 42 -11- -11- U.S.C.  S  2000e-3(a).   Elsewhere, the statute lists actions that can  constitute discrimination, specifying a refusal to hire, a discharge, or any discriminatory treatment with respect to "compensation,  terms,  conditions, or privileges of employment." Id. S 2000e-2(a). Arguably, the two sections should be read together. Even so, "terms, conditions, or privileges" is pretty open-ended  language. It obviously includes opportunities that are not strictly entitlements, Hishon v. King & Spalding, 467 U.S. 69, 75-76 (1984) (promotion to partner); and a number of cases have extended coverage to slights or indignities that might seem evanescent, e.g., McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 484 (7th Cir. 1996) (employee given tedious  minor duties); Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992) (daily ridicule in clients' presence). On occasion, disadvantageous transfers have been treated as  potentially  within  the scope of Title VII. E.g., Collins v. Illinois ,  830 F.2d 692, 702-04 (7th Cir. 1987) (citing cases). The main authority cited by the district court, Haimovitz v. United States Dep't of Justice, 720 F. Supp. 516 (W.D. Pa. 1989),  aff'd , 902 F.2d 1560 (3d Cir. 1990), did reject a claim where the employee had been transferred to another location; but  while  the  opinion  is  not crystal clear, the main reason was apparently  a  failure to show an illegal motive. Id. at 525-27. -12- -12- Here, the claim concerns a refusal to transfer, arguably less intrusive than involuntary relocation. But Randlett's affidavits make clear that at HHS a permanent transfer for hardship  reasons is a common enough practice and so arguably a "privilege"  of  employment. For Randlett, the transfer here was doubtless as important as a promotion. Assuming an improper motive,  it  is hard to see why denial of a hardship transfer in this case could not be discrimination under Title VII. See Bauman  v.  Blo ck, 940 F.2d 1211, 1229 (9th Cir.), cert. denied, 502 U.S. 1005 (1991). No doubt construing the statute in this manner opens the way to whimsical claims by employees who earlier filed complaints and are now aggrieved by slights. Possibly, there is room for a de minimis threshold, Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996), and certainly good reason to insist on firm evidence of improper motive by the employer. But given the impact on Randlett, and her affidavits about customary practice, we cannot accept the HHS view  that  a  refusal to transfer is automatically outside Title VII. We turn, therefore, to the district court's alternative ground, namely, the lack of a "scintilla of evidence" to show retaliation.   To  make  out a retaliation claim requires not only an  adverse  employment action and previously protected conduct, but  also  a  colorable showing that "a causal connection existed -13- -13- between  the  protected  conduct and the adverse action." Fennell v.  First  Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). In  other  words,  the  adverse action must have been taken for the purpose of retaliating. And to defeat summary judgment, a plaintiff must point to some evidence of retaliation by a pertinent decisionmaker. Id. The  denial  of  a  permanent transfer to the Boston office is the principal decision challenged by Randlett, and every indication  is  that  this  decision was made by the HHS Office for Civil  Rights  in  Washington. Randlett's request was made to the Washington office and denied by the Washington office. Randlett herself wrote to the Boston EEO officer a few days after filing her complaint to say that the concern was "with the  actions  of OCR [Office of Civil Rights] in Washington, not Denver."   See generally Long v. Eastfield College, 88 F.3d 300 (5th Cir. 1996). It was thus incumbent on Randlett, to justify trial on this  issue,  to  point  to  some evidence to show that officials in the Washington establishment had refused a permanent transfer to retaliate against Randlett for her 1975 complaint. See Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991),  cert.  denied, 504 U.S. 985 (1992). This need to show a connection exists whether Randlett was seeking to make out a prima  facie  case  or  by  independent evidence challenging the HHS explanation as pretext and urging independent evidence of -14- -14- discrimination. Fennell, 83 F.3d at 535. The latter is the better  perspective  since  (even before the lawsuit began) Dick's letter did explain HHS' reasons for denying a permanent transfer. The  difficulty for Randlett is that there is virtually no evidence that HHS officials in Washington acted out of a retaliatory  motive  in  denying the permanent transfer to Boston. Randlett's  main  argument  for inferring an improper motive--that is, a connection to her previous complaint--is based on her affidavits about HHS practice in granting hardship transfers. If HHS handed out transfers as a matter of course whenever an employee showed a hardship need, it might well be suspicious were Randlett alone singled out for a denial. But  in  fact  there  is  no  showing that in denying Randlett's request,  HHS  was departing from its usual practice. Carefully read, all that the affidavits say is that HHS often granted hardship transfers in similar cases; there is no indication that HHS granted them invariably and without regard to the convenience of the agency. And in this instance HHS, in denying  Randlett's request, explained that reductions in force ("RIFs")  and  budget  cuts  had reduced its flexibility and it was not convenient to the agency to transfer Randlett permanently to Boston. Randlett's only other evidence is several affidavits describing  reassignments and hires within the Boston office in -15- -15- or around 1982. This confirms that there were some reassignments (due, at least in part, to the RIFs mentioned in Dick's letter) and at least one new hire for a GS-12 position after Randlett's resignation. But nothing in the affidavits shows retaliation against Randlett. At most, one might conclude that some other mix of reassignments might have produced a GS-13 position for Randlett, doubtless to the disadvantage of some other employee. Whatever inference might be drawn from any of the affidavits  has  to  be  set  against other facts. However careless Jefferson may have been in arranging Randlett's timely reassignment to Denver, higher officials in Washington--who were responsible for refusing the permanent transfer--had helped Randlett from the start, both by securing a temporary position in Boston and by deferring her start date in Denver. Taking everything together, no basis exists for a jury to conclude that the permanent transfer was denied in order to retaliate. Our causation analysis would be quite different if Randlett's claim related to Aguilar's action in refusing to grant an additional temporary delay to Randlett to permit her to delay reporting to duty in Denver in early 1983. The tone of  Aguilar's  alleged  remarks, quoted above, might create a jury issue as to Aguilar's own motive in refusing Randlett's requests to him. This is so even though, absent the remarks, -16- -16- the Denver office had good reason for wanting Randlett to report  to  duty  (apparently, it was paying for Randlett's detail to Boston and had to leave her permanent position unfilled). We need not decide this issue because Randlett has not complained of the Denver office's denial of further temporary deferrals in her reporting date. Rather, her 1982 administrativ e complaint, which was the condition precedent to this lawsuit, see 42 U.S.C. S 2000e-5(f), is directed at the Washington  officials' denial of a permanent transfer. That is the  relief  she seeks in the district court. No claim was made concerning  Aguilar's denial of a further temporary deferral of her return to Denver. The statutory regime requiring exhaustion of administrative  remedies  itself precludes any effort by Randlett at this late date to develop and pursue a new charge directed against Aguilar's own conduct in refusing further deferrals. Lattimore  v.  Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996). Nor is this some slip of the pen: everything in Randlett's situation makes clear that the central grievance relates to Washington's denial of a permanent transfer to Boston. Accordingly, Aguilar's actions in Denver, whatever their motive, would not support a trial of the only claims that Randlett has made and preserved. No one can view with pride HHS' record of delay in investigating this case or fail to sympathize with Randlett's -17- -17- predicament-- a job in one city and an aging parent in another. At oral argument, we forcefully urged the parties to seek a settlement and asked them to use our court's settlement program, delaying this decision until we were advised that efforts  at  settlement had failed. It will now be obvious that both sides would have gained through a settlement.  In sum, we affirm the decision of the district judge on the grant of summary judgment, although our reasoning differs in certain respects, and we decline to order costs for either side. It appears from the briefs and oral argument that a ministerial  issue  relating to the calculation of certain health insurance  benefits due to Randlett remains to be resolved. We therefore remand the case to the district court for this limited purpose. It is so ordered. -18- -18-