Victor E. SIMAS, Plaintiff,

v.

**FIRST CITIZENS' FEDERAL CREDIT UNION, Barbara Silva, and Lisa Grace, Defendants.**

No. Civ.A. 96–10073–MLW.

United States District Court, D. Massachusetts.

March 6, 1998.

John K. Markey, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Philip N. Beauregard, Beauregard & Burke, New Bedford, MA, for Plaintiff.

Michael P. Duffy, Harvey Weiner, Peabody & Arnold, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER ON DE-FENDANTS, FIRST CITIZENS' FED-ERAL CREDIT UNION, BARBARA SILVA AND LISA GRACES MOTION FOR SUMMARY JUDGMENT (# 26)*

COLLINGS, United States Magistrate Judge.

### I. Introduction

In January, 1996, plaintiff Victor E. Simas (hereinafter "Simas") filed a six-count complaint naming as parties defendant First Citizens' Federal Credit Union (hereinafter "First Citizens"), Barbara M.W. Silva (hereinafter "Silva"), and Lisa A. Grace (hereinafter "Grace"). Simas is a former employee of First Citizens, having worked at the credit union from 1983 through May of 1994. At all relevant times, defendant Silva served as both the Chief Operating Officer and President of First Citizens. Defendant Grace too was employed at First Citizens, from 1993 through May of 1994 holding the position of Senior Vice President of the Mortgage Department. The plaintiff alleges that he was subjected to unlawful discrimination and constructively discharged in retaliation for having "blown the whistle" on certain purported improprieties involved in a particular real estate loan made by the credit union.

With the parties' consent, this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). At a subsequent conference, a discovery schedule was set and thereafter discovery continued apace, albeit with minor skirmishes. With discovery complete, the defendants have filed a motion for summary judgment on the complaint in its entirety together with a statement of undisputed facts, a memorandum of law and exhibits. In response, Simas has submitted a substantive opposition to the motion for summary judgment including a statement of material facts, a memorandum of law, affidavits and exhibits. With the record now complete,[1] the defendants' motion for summary judgment is in a posture for decision.

## II. The Facts

The historical facts underlying this litigation are in large measure undisputed.[2] Beginning in January of 1983 Simas was employed by First Citizens, working his way up from his initial position as a collector ultimately to attain the position as Vice President of Credit and Collections. (Defendants, First Citizens' Federal Credit Union, Barbara Silva and Lisa Grace's Statement of Undisputed Facts # 25 ¶¶ 1, 4, 5; Plaintiff's Statement of Material Facts # 36 ¶ 2[3]) According to the plaintiff, over the years he was recognized and acknowledged as a hard worker with his performance evaluations consistently ranging from good to excellent. (# 36 ¶ 2) At the same time, Simas did have some weak points, including being quick tempered with co-workers, difficult and moody. (Affidavit of Michael P. Duffy, Esq., # 29, Exh. E)

As earlier noted, defendant Silva was the President of First Citizens. (# 25 ¶ 2; # 36 ¶ 1) She was the plaintiff's supervisor and, indeed, was responsible for all personnel decisions. (# 36 ¶ 1) During the relevant time period defendant Grace, Silva's daughter, was the Senior Vice President of the Mortgage Department. (# 25 ¶ 3; # 36 ¶ 1) In this position, Grace was involved only with personnel actions affecting employees within her department. (# 25 ¶¶ 3, 28)

In August of 1990, First Citizens made a loan to one Louis Xifaras, an individual who was then the Vice Chair of the credit union's Board of Directors and a member of the Building Committee. (# 25 ¶ 8; # 36 ¶ 3) He was also a friend of Silva. (# 36 ¶ 3) The $800,000 loan, the largest ever granted by First Citizens, was secured by Mr. Xifaras' residence and other property appraised at the time to be worth $1,030,000. (Id.) Grace was the person who processed the loan and presented it to the Board of Directors for approval. (Id.)

Approximately two years later in August of 1992, Simas, on behalf of First Citizens management team, requested a meeting with two members of the Board of Directors of the credit union to discuss concerns that defendant Grace was being given preferential treatment by First Citizens and its Board. (# 25 ¶ 9) At that meeting according to the plaintiff

> I brought up some concerns about what we felt was the, quote, unfairness or disparity between departments in obtaining resources, be it furniture, office equipment, personnel, things like that, and we felt Lisa's contact or increasing contact with the board of directors was playing a role in that.

Statement of Undisputed Facts # 25, Exh. A at 47.

It was in August, 1993, that Simas first became aware that due to his intent to file for bankruptcy, Xifaras would likely default on the $800,000 loan from First Citizens'.[4]

---

1. Two other motions, one by the plaintiff pursuant to Rule 56(f), Fed.R.Civ.P., and the other by the defendants to strike shall be decided on the papers.

2. Reference will be made to the plaintiff's statement of material facts so long as those facts are adequately supported by record citations.

3. In their respective statements, the parties cite to proffered evidence in support of their proposed facts. Throughout this recitation, reference shall be made only to the paragraphs of the statements, not to the foundational materials.

4. In fact, Xifaras did default on the loan in October of 1993 and, thereafter, declared bankruptcy. (# 25 ¶ 11)

(Affidavit of Victor E. Simas # 35 ¶ 4) The plaintiff discussed the loan with Silva the following month and, thereafter, on or around September 17, 1993, spoke with Jeanine Watts (hereinafter "Watts"), the internal auditor of the credit union. (# 25 ¶ 12; # 35 ¶ 5) Simas requested that Watts conduct a full investigation into the processing of and circumstances. surrounding the loan. (*Id.*) According to the plaintiff, while agreeing that the size of the loan was unusual, Watts declined to go to the Board of Directors "without facts". (# 36 ¶ 4) The defendants contend that Watts "conducted a review of plaintiff's suspicions and found in her opinion that there was no basis for any of plaintiff's suspicions." (# 25 ¶ 12) Thereafter Simas and Watts had a series of telephone conversations wherein the tension between the two mounted, and ultimately led to Watts contacting Silva to complain about Simas' conduct.[5] (# 25 ¶ 12; # 35 ¶ 5) Upon learning of the telephone call to Silva, the plaintiff again called Watts to tell her that her actions could get him fired, and that he might get in touch with either the press or the National Credit Union Administration ("NCUA") with respect to the loan. (# 36 ¶ 5) Watts apparently reported this conversation with Simas to Silva. (*Id.*)

The minutes of a September 27, 1993 meeting of the First Citizens Personnel Committee meeting reflect the following:

> President Silva informed the committee that a request has been made by Vice President Vic Simas relative to a $4,000 student loan. She refused this request due to the fact that Mr. Simas had filed bankruptcy in 1990 and said loan, if granted, would not be guaranteed by the federal government should a delinquency occur when payment became due and payable (copies of Simas memo attached).
>
> Ms. Silva also informed the committee that recent conduct by Mr. Simas (not the first time) has caused emotional distress to members of the management team. Discussion was held relative to Ms. Silva's charges and the following recommendations were made to her:
>
> 1. That the loan request by Mr. Simas be brought before the full board for approval or disapproval.[6]
>
> 2. That Ms. Silva record instances which can be verified in which, in her opinion, has been of improper behavior [sic] on the part of Mr. Simas representing an. officer of this credit union. Reference to previous evaluations should be recorded. This evaluation may be used as a warning and possible termination could result should repeated offenses again occur.

Affidavit # 35, Exh. L.

The plaintiff states that thereafter he was contacted by the then chairman of the Board of Directors, Ed Harrington (hereinafter "Harrington"), who inquired about what had happened with Watts. (# 35 ¶ 7) According to Simas, he explained that he had asked Watts to investigate the Xifaras loan; although Harrington purportedly indicated that he would look into the situation, Simas never heard back from him. (*Id.*)

In a five-page memorandum dated October 8, 1993, Silva, in pertinent part, wrote the following to the plaintiff:

> It has again been brought to my attention that your conduct as an officer and employee of this credit union has caused an eruption of emotional stress among a number of employees.
>
> It is my understanding that a telephone call was made to the home of an officer of the credit union on Friday evening, September 17, 1993. Allegations were made by you relative to a member's account and to which you requested she check your "suspicions." The officer informed you, at that time, she would inform "her boss" (Chairman of the Supervisory Committee)

---

**5.** Simas claims that on or about September 20, 1993, the Vice President of Lending of First Citizens agreed with the plaintiff that the appraisals for the Xifaras loan were "suspect" and "inflated", and that he imparted this information to Watts. The defendants object to this alleged fact. It appears to be undisputed that after the default in 1993 the real estate securing the loan was appraised to be valued at $538,000. (# 36 ¶¶ 4, 6)

**6.** The Board ultimately voted to grant this loan to Simas. (# 25 ¶ 19)

relative to your comments. A review was conducted by the officer as to these allegations on Monday, September 20, 1993 which resulted in her opinion that there was no basis of any improprieties.

She called you at your office on Thursday (September 23, 1993) and reported her findings. The phone call to you then resulted in threats to the credit union (personally calling NCUA and/or Standard Times). I understand an effort was made to calm you but you became more irrational and aggressive and subjected the officer to verbal abuse and harassment by a series of telephone calls to her that day.

To question a situation or decision at the credit union through proper channels is understandable and permissible.

To accuse someone of an alleged impropriety in making a decision without any proof is inexcusable and will not be tolerated.

You are well aware that I have personally spoken to you over the years regarding various instances where I have felt you have used poor judgment.

\* \* \* \* \* \*

Your professional and performance skills in the credit/collection department are excellent. You have developed a viable and well-organized department. You have kept abreast of all new regulations and changes in the law which affect your department. Bankruptcy laws have changed constantly and I feel assured that your handling of these cases are within the parameters of the law. You have constantly met the goals set for your department year after year.

However, your personality traits and offensive behavior have been a constant problem and will no longer be tolerated by this credit union. Your dissatisfaction with your peers and employment conditions apparently are still disturbing you.

I again offer you the benefit of a meeting with me to attempt to eliminate any

dissatisfaction or problems you have if at all possible.

Accept this review as a final warning that should any further verbal harassments, unwarranted charges or threats be made by you, immediate termination shall take place.

Statement of Undisputed Facts # 25, Exh. E; Plaintiff's Statement of Material Facts # 36, Exh. K.

The plaintiff contends that in October of 1993 he was told by the Senior Vice President–Chief Financial Officer of the credit union that he should have been fired for bringing everything up about the Xifaras loan. (# 36 ¶ 9) Further, although it was Simas' responsibility to collect delinquent loans, he was told by Silva not to deal with the Xifaras delinquency. (# 36 ¶ 10) At this juncture the plaintiff asserts that he feared for his job. (# 36 ¶ 11)

In the fall of 1993, several events took place. Silva called the NCUA to report the loss on the Xifaras loan as required by federal statutes and regulations. (# 25 ¶ 15) First Citizens hired credit management consultants, Cobblestone Management, to investigate the underwriting and propriety of the Xifaras loan. (# 25 ¶ 14; # 36 ¶ 12) Simas contacted the Federal Bureau of Investigation with respect to the loan.[7] (# 25 ¶ 16; # 36 ¶ 13) The plaintiff also made an anonymous call to the NCUA fraud hotline about the Xifaras loan; he later called again and identified himself as a Vice President of the credit union. (# 25 ¶ 17; # 36 ¶ 14) At the regular monthly meeting of the Board of Directors on October 18, 1993, the board voted that no pay raises were to be given to the management team as recommended by Silva and the recommendation that bonuses be awarded to the management team was denied. (# 25 ¶ 18) It was also at this meeting that the board approved the educational loan to the plaintiff. (# 29, Exh. H)

The NCUA conducted its annual audit of First Citizens in January, 1994. (# 25 ¶ 23; # 36 ¶ 15) Simas contacted the NCUA again, this time identifying himself. (# 36 ¶ 15) Al-

---

7. The plaintiff admits that he did not tell anyone at First Citizens about his contact with the FBI. (# 25 ¶ 16)

though it was routine for the auditors to meet with the plaintiff given his position as Vice President of Collections, Simas contends that the frequency of these meetings, including meeting with a single auditor in his office, was unusual for an annual audit. (*Id.*) As a result of this audit, the NCUA issued a letter of understanding and agreement to be signed by the members of the Board of Directors of First Citizens which read, in part: "The examination disclosed the presence of adverse conditions and trends. If left unresolved, these problems will jeopardize the financial condition and/or operations of the First Citizens' Federal Credit Union." (# 36, Exh. N) Included within these problems was the granting of a member business loan to Xifaras "without the support of a comprehensive written Member Business Loan program." (*Id.*)

Simas does not allege that he advised either Silva or Grace that he had contacted the NCUA; both women have testified that they were not aware that the plaintiff had reported the Xifaras loan to the NCUA. (# 25 ¶ 24)

In the plaintiff's view, after September of 1993 he "experienced an abrupt and substantial change in the way that he was treated by the credit union." (# 36 ¶ 22) Co-workers no longer socialized with him. (# 36 ¶ 23) A car loan for which he applied was not approved, and Silva opposed granting him the educational loan. (# 36 ¶ 24) According to his answers to interrogatories, the acts evidencing this "abrupt and substantial change" include the following: Silva refused to perform the normal yearly evaluation of him, refused to take his requests for promotion to the Board of Directors, refused to take his request to attend a seminar to the Board of Directors, refused to take his request for a cellular phone to the Board of Directors, and she no longer allowed him to attend meetings of the Board of Directors. (# 25 ¶ 21; # 29, Exh. I; # 36 ¶ 25) Further, the plaintiff claims that he was removed from authority over credit department personnel; he could not approve credit card applications; he was deprived of the position of network administrator; he could not handle mortgage delinquency matters; he could not go into the file vault; he could not assist in the loan department; and he was not allowed to be the operating officer of First Citizens when the president was out of state. (# 25 ¶ 21; # 29, Exh. I; # 36 ¶ 25).

By letter dated May 2, 1994, Simas tendered his resignation from the credit union effective May 13, 1994, to Silva in order to take a position at Compass Bank. (# 25 ¶ 25; # 36 ¶¶ 27, 28) On May 3, 1994, Silva, the Chief Financial Officer, and the Chairman of the Board of First Citizens decided it would be in the best interest of the credit union that the resignation be made effective immediately, and Simas was asked to pack up his personal belongings at once and he was escorted from the building. (# 25 ¶ 25; # 36 ¶¶ 29, 30) When co-workers questioned why he had been escorted out, they were advised "that it was common practice in other financial institutions to ask officers to leave the premises immediately upon their resignation." (# 25 ¶ 26; # 36 ¶ 30) According to Simas, no other officer had ever been escorted from the building. (# 36 ¶ 30)

Pursuant to NCUA rules and regulations, in a May 3, 1994 letter, Silva informed the NCUA Regional Director of the plaintiff's resignation. (# 25 ¶ 30; # 36 ¶ 31) This letter read in part:

> Because of various memos to me from Mr. Simas, it had become obvious that Victor was a disgruntled employee.
>
> Due to his position and access to confidential information, I felt that the best interest of the credit union would be served by requesting Mr. Simas to leave immediately. Due to this request, he will be paid for the two (2) week notice plus any accrued vacation time.

Affidavit # 29, Exh. L; # 36, Exh. U.

This letter was copied to the NCUA District Examiner, the Board of Directors of First Citizens, the Assistant Vice President—Human Resources of the credit union, and the Director of Internal Audit and Compliance of First Citizens. (*Id.*)

This recitation of facts is sufficient to set the stage. Any additional facts needed for contextual purposes shall be added within the course of the discussion.

### III.  The Claims

Count I of the complaint sets forth a claim for wrongful termination; Simas alleges that the defendants discharged him "in bad faith and in violation of public policy" all "in retaliation for his conduct and whistleblowing." (# 1, ¶ 27) A claim for defamation is advanced in Count II. Next, in Count III the defendants are alleged to have negligently or intentionally inflicted emotional distress upon the plaintiff.  In the single federal claim, Count IV, Simas asserts that the defendants are liable for constructive discharge and discrimination against a credit union employee in violation of 12 U.S.C. § 1790b.  Finally in the last count of the complaint, Count V, the plaintiff contends that the individual defendants, Silva and Grace, intentionally interfered with the advantageous economic relationship that he enjoyed with First Citizens.

The scope of these claims was narrowed by the plaintiff in his opposition to the defendants' dispositive motion.  Therein, Simas states that he

> opposes Defendants' motion for summary judgment on his claim under 12 U.S.C. sec. 1790b as to Defendant First Citizens, on his claim for wrongful termination as to Defendant First Citizens, on his claim for tortious interference as to Defendant Silva, and on his claim for defamation as to Defendants First Citizens and Silva.  Plaintiff does not oppose Defendants' motion as to his remaining claims.

Plaintiff's Opposition # 33 at 1–2.

### IV.  The Summary Judgment Standard

When considering whether to grant summary judgment, the court must determine whether:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is a genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

In making this assessment, the court must "accept all reasonable inferences favorable to the nonmovant." *Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 205 (1 Cir., 1996); *see also Lawton v. State Mut. Life Assurance Co. of America,* 101 F.3d 218, 222–23 (1 Cir., 1996); *Borschow Hospital and Medical Supplies v. Cesar Castillo, Inc.,* 96 F.3d 10, 12 (1 Cir., 1996); *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 253 (1 Cir., 1996); *One Nat'l Bank v. Antonellis,* 80 F.3d 606, 608 (1 Cir., 1996).

A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  In deciding whether a factual dispute is "genuine", the court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id.; see also Serrano–Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 25 (1 Cir., 1997); *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1 Cir.1996); *Roche,* 81 F.3d at 253.  In weighing whether a factual dispute is "material", the court must examine the substantive law of the case, because "only disputes over the facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *see also Vinick v. Commissioner of Internal Revenue,* 110 F.3d 168, 171 (1 Cir., 1997); *Sanchez,* 101 F.3d at 227; *Roche,* 81 F.3d at 253.  "Thus the substantive law defines which facts are material." *Sanchez,* 101 F.3d at 227 (citing *Anderson,* 477 U.S. at 247–48).

Rule 56 does not permit the party opposed to the summary judgment motion to rest upon the mere allegations or denials in its own pleadings.  *See Int'l Ass'n of Machinists and Aerospace Workers,* 103 F.3d at 205 (quoting *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 794 (1 Cir., 1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)) ("The core purpose of the summary judgment procedure is to 'pierce the boilerplate of the pleadings' and evaluate the proof to determine whether a trial will serve any useful purpose.").  Rather, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion a party who fails to make a showing sufficient to establish the existence of

an element essential to the party's case, and on which the party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### V.   Discussion

It is best to begin with the sole federal claim, to wit, the purported violation of 12 U.S.C. § 1790b. The credit union employee protection remedy statute provides, in part, that

> No insured credit union may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Board or the Attorney General regarding any possible violation of any law or regulation by the credit union or any director, officer, or employee of the credit union.

Title 12 U.S.C. § 1790b(a)(1).

Simas contends that he was constructively discharged in violation of this statute for "blowing the whistle" on suspected improper conduct with respect to the Xifaras loan.

As an initial basis for seeking the entry of judgment, the defendants argue that the plaintiff has produced no evidence to show that they had any knowledge whatsoever of his calls to either the FBI or the NCUA and, therefore, they could not have taken any adverse action against him consequent to any whistleblowing. This question need not be resolved, however, since another issue is dispositive of the case.

■ Simas contends that he was constructively discharged in contravention of the statute. In a recent reiteration of the applicable standard, the First Circuit wrote:

> We have long applied an "objective standard" in determining whether an employer's actions have forced an employee to resign. See, e.g., *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.

1986). For the transfer proposed by [the defendant] to be deemed a constructive discharge, " 'the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign,' " *Id.* (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)). An employee may not, therefore, be unreasonably sensitive to a change in job responsibilities.

*Serrano–Cruz v. DFI Puerto Rico, Inc.* 109 F.3d 23, 26 (1 Cir., 1997). Again citing the *Calhoun* decision, the Court has noted "that an employee is not 'guaranteed a working environment free from stress.' " *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 481 (1 Cir., 1993) (citations omitted). In short,

> A constructive discharge requires a "change in working conditions so difficult or unpleasant as to force [plaintiff] to resign." *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977), quoting *Crystal Princeton Refining Co.,* 1976 WL 7836, 222 N.L.R.B. 1068, 1069 (1976). Loss of prestige, humiliation, and embarrassment do not amount to a constructive discharge unless extreme. *Alicea Rosado,* 562 F.2d at 120.

*Mahoney v. Driscoll,* 727 F.Supp. 50, 52 (D.Mass., 1989).

■ It appears when comparing the plaintiff's affidavit to his interrogatory answers that at this point he has eliminated at least some of his complaints, for instance whether he had a cellular telephone [8] or whether he received a car loan.[9] Even considering the conduct in its entirety, however, overall the plaintiffs litany of complaints are nothing more than minor slights. There is no allegation made that Simas was demoted or that his compensation was reduced at any time. While failing to have been appointed as operating officer of the credit union for one week may have been embarrassing, it certainly can not be seen as having forced the plaintiff out. So, too, the fact that he was not allowed to

---

8. The defendants claim that in fact a cellular telephone was purchased for all employees and that Simas had access to it. (# 28 at 7)

9. The defendants claim that the credit union has no record of an application for a car loan. (# 28 at 8)

attend one particular seminar. Taking each incident individually, or considering the alleged pattern of conduct as a whole, from an objective point of view a reasonable person quite simply could not find on this record that Simas' working conditions were made so difficult or intolerable as effectively to compel him to resign. In short, the plaintiff has not proffered sufficient evidence to support his claim of constructive discharge.

Although the argument is not developed in his memorandum, nor, indeed, does he cite any relevant cases, the plaintiff asserts that he need not prove that he was constructively discharged in order to establish a claim under 12 U.S.C. § 1790b. Rather, the plaintiff contends that

> [h]e is only required to show that First Citizens retaliated against him with respect to the "terms, conditions, or privileges" of his position. There is evidence that First Citizens began treating him differently shortly after he threatened to contact the NCUA and then proceeded to do so. He was shunned by co-workers, deprived of various benefits, and had his responsibilities reduced (after 10 years of "excellent" work). This is actionable under the statute.

Memorandum In Support # 34 at 3.

At the outset, it is open to question whether the plaintiff has a claim separate from the one for constructive discharge. As the First Circuit wrote in *Serrano–Cruz*:

> Serrano contends that the district court erred by failing to consider whether she had established a prima facie case of "adverse employment actions," as distinguished from the issue of constructive dismissal. Based on the recitation of damages in Serrano's amended complaint, however, her suit is plainly one seeking a remedy for improper dismissal, and not one seeking a remedy for adverse employment actions. Her allegations regarding damages consist of the following: lost income and benefits from the date she was forced to resign, and various other damages she and her husband have incurred arising out of the economic hardship brought about by her dismissal. All of Serrano's alleged economic harms

would not have come about had Serrano accepted the position, which offered the same salary and benefits. *See Shealy v. Winston,* 929 F.2d 1009, 1012 n. 2 (4th Cir.1991) (finding no constructive discharge and holding there is no further ground for relief on theory of adverse employment action, because "appellant would then face the barrier of proving any damages when he clearly would have been employed ... at the same salary and benefits."). For example, the removal of various responsibilities from Serrano in the months preceding the proposed transfer, if they are seen as separable from her resignation, cannot, even if proven to be discriminatory, support this suit for lost income and benefits. Given the way Serrano has framed this lawsuit, relief cannot stem from a finding that the actions of DFI, short of leading to her dismissal, were discriminatory adverse employment actions.

*Serrano–Cruz,* 109 F.3d at 28 (footnote omitted).

In the present case Simas alleges that as a result of his whistleblowing, he "suffered loss of income and employment benefits, loss of personal reputation, and other financial losses." (Complaint # 1 ¶ 32) Thus, like the plaintiff in *Serrano–Cruz,* Simas is seeking damages for the loss of his job in Count IV, and little, if anything, else.

Even if it is assumed for present purposes that in fact Simas has alleged a distinct claim for discrimination, he fares no better. Discussing the language "terms, conditions, or privileges" in the Title VII context, the First Circuit has acknowledged the difficulty in deciphering "what types of employer actions adverse to the employee can, where improperly motivated, give rise to a Title VII complaint." *Randlett v. Shalala,* 118 F.3d 857, 862 (1 Cir., 1997). The Court wrote:

> ... "[T]erms, conditions, or privileges" is pretty open-ended language. It obviously includes opportunities that are not strictly entitlements, *Hishon v. King & Spalding,* 467 U.S. 69, 75–76, 104 S.Ct. 2229, 2233–34, 81 L.Ed.2d 59 (1984) (promotion to partner); and a number of cases have extended coverage to slights or indig-

nities that might seem evanescent, *e.g.,* *McKenzie v. Illinois Dep't of Trans.,* 92 F.3d 473, 484 (7th Cir.1996) (employee given tedious minor duties); *Aviles–Martinez v. Monroig,* 963 F.2d 2, 6 (1st Cir.1992) (daily ridicule in clients' presence.)

*Randlett,* 118 F.3d at 862.

In a recent dissenting opinion, Senior Circuit Judge Bownes cited cases exemplifying types of adverse employment actions:

> *See, Wyatt [v. City of Boston],* 35 F.3d [13] at 15–16 [ (1st Cir., 1994) ] (pointing to "other adverse actions" covered by Title VII "such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees"); *Dominic v. Consolidated Edison Co. of New York, Inc.,* 822 F.2d 1249, 1254–1255 (2d Cir.1987) (holding an unfavorable transfer to constitute an adverse employment decision); *DeNovellis v. Shalala,* 124 F.3d 298, 306 (1st Cir.1997) (noting that taking something of consequence from an employee, including divesting her of significant job responsibilities, constitutes an adverse employment action.)

*Denovellis v. Shalala,* 135 F.3d 58, 74–75 (1st Cir.1998) (Bownes, J., dissenting).

At most in this case the plaintiff has alleged a few minor, isolated instances of behavior, unlike even the "evanescent" slights in *McKenzie* and *Aviles.* There is no basis for inferring that Simas' job was somehow impaired or made more difficult by the fact that co-workers purportedly shunned him or that he was not permitted to attend a seminar in Kentucky or that he was not asked to serve as operating officer of the credit union for a week in the president's absence or that he did not report to meetings of the Board of Directors. *See, e.g., McKenzie,* 92 F.3d at 485. Moreover, some of the plaintiff's complaints about adverse employment actions are very vague. For example, while he states that he was "removed from authority over credit personnel" (# 35 ¶ 22), Simas proffers no facts to explain the extent of his prior authority and the significance of the "removal." The same is true with respect to his complaint that he "was no longer allowed to approve credit card applications". (# 35 ¶ 22) There is no basis to judge the importance or impact, if any, of this action upon the plaintiffs job. In short the vast majority of conduct that Simas views as being adverse employment acts is either unsupported in fact, or does not rise to a level of significance, severity, or continuity so as to constitute discriminatory actions. That having been said, there are two instances of alleged conduct which require further discussion: the purported failure to give Simas a raise and the purported failure to promote him.

When addressing whistleblowing claims under comparable statutes, as, for example, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), 12 U.S.C. § 1831j [10], courts have applied a burden-shifting analysis of the type employed in retaliation claims bought under Title VII. *See, e.g., Rouse v. Farmers State Bank Of Jewell, Iowa,* 866 F.Supp. 1191, 1204 (N.D.Iowa, 1994); *Walleri v. Federal Home Loan Bank,* 965 F.Supp. 1459, 1466–67 (D.Or.1997). By virtue of 1993 amendments, the provisions of FIRREA do include reference to the burden of proof in a claim, however, which alters the traditional Title VII test: "[t]he burden on the plaintiff in a whistleblower case appears to be less than that upon a plaintiff in a Title VII case, and that on the defendant is heightened." *Rouse,* 866 F.Supp. at 1208; *Haley v. Fiechter,* 953 F.Supp. 1085, 1093–94 (E.D.Mo., 1997). The

---

**10.** This statute reads, in part:

(a) In general

  (1) Employees of depository institutions

    No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any Federal Banking agency or to the Attorney General regarding—

    (A) a possible violation of any law or regulation; or

    (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;

by the depository institution or any director, officer, or employee of the institution.

Title 12 U.S.C. § 1831j(a)(1)(A) and (B).

plaintiff must prove that the whistleblowing was a contributing factor vis-a-vis the alleged adverse employment in order to establish a prima facie case. *Rouse*, 866 F.Supp. at 1208; *Haley*, 953 F.Supp. at 1094. To counter, the defendant must show "by clear and convincing evidence that it would have made the same employment decision in the absence of plaintiffs disclosures." *Rouse*, 866 F.Supp. at 1208; *Haley*, 953 F.Supp. at 1094–95. Although there is no burden of proof provision under the credit union employee protection statute, the defendants advocate the application of this whistleblowing standard which is deferential to the plaintiff in this case. Accepting without deciding that the defendants' position is correct, even under this more lenient standard the plaintiffs claim must fail.

■ Again assuming that Simas can prove a prima facie case, the defendants have proffered clear and convincing evidence that those acts which the plaintiff alleges to be significant adverse employment actions[11] would have occurred regardless of the plaintiff's whistleblowing activities. First, although Simas complains that he was not given a raise, the record evidence unequivocally reflects that the Board of Directors of First Citizens voted at the October, 1993 monthly meeting that no member of the management team was to receive either a pay raise or a bonus that year. In other words, the entire management team was treated in exactly the same manner. It was irrelevant that the plaintiff may have blown the whistle; whether or not Simas had called the NCUA, he would not have been granted a pay increase.

Secondly, the plaintiff complains that he was not promoted. However, the only evidence proffered on this question by the plaintiff is a letter from the plaintiff to the personnel committee (# 29, Exh. G) dated June 7, 1993 in which he stated that he wished to be a candidate for Executive Vice–President. It is not clear whether Simas is proposing the creation of a new position for himself or that

he fill a vacancy. If the former, there is nothing in the record as to what became of the proposal, much less evidence that any action or inaction on the proposal had anything to do with plaintiffs whistleblowing. Similarly, if the proposal was that he fill a vacancy, Simas has offered no evidence as to whether the position was ever filled, and if it was, who filled it, and how the fact that someone other than plaintiff filled it had anything to do with plaintiff's whistleblowing.

The only other evidence is the testimony given by Silva in her deposition wherein she states that

A. The only promotion I can recall is he [Simas] wanted to be in charge of—when Mr. Bessey left, the board made the decision not to replace that position. It was a board decision. That was brought to the board.

\*   \*   \*   \*   \*   \*

A. He [Simas] requested to be vice president of consumer lending, the position of Bill Bessey. The board informed me they were not going to replace that position. There was no opening.

\*   \*   \*   \*   \*   \*

Q. Why did the board choose not to fill Bill Bessey's position?

A. Because they didn't want to hire anyone or put anyone in there, and they told me to take charge of it, which I did.

Q. Why didn't they want to fill the position?

A. They just at that point didn't want to fill the position. It was their decision.

Affidavit # 29, Exh. B at 160–61.

As to this position, on this state of the record, it is once more clear that the plaintiff would not have been promoted to the vice president position that he desired which had previously been occupied by Mr. Bessey irrespective of his whistleblowing activities be-

---

11. It should be noted that Simas does not raise the issue of a pay increase or a promotion in his statement of disputed facts, his affidavit, or his memorandum in opposition to the summary judgment motion. Thus, while it is unclear if the plaintiff is now choosing not to pursue these particular allegations, they are included as purported adverse employment acts in his interrogatory answers.

cause there quite simply was no job opening. The Board of Directors decided not to fill the position held by Mr. Bessey, and there is no evidence that the board's decision had anything to do with plaintiffs whistleblowing.

In sum, the plaintiff has not submitted evidence sufficient to raise a genuine issue of material fact with respect to his whistleblowing claim under federal law. Consequently, Count IV alleging violation of 12 U.S.C. § 1709b fails as a matter of law.

■ With judgment to enter for the defendant credit union on the one federal claim advanced by the plaintiff, "the Court ought not retain supplemental jurisdiction over the state claims." *McDonald v. Commonwealth of Massachusetts*, 901 F.Supp. 471, 473 (D.Mass., 1995); *See also Camelio v. American Federation, Etc., et al.*, 137 F.3d 666, 672 (1st Cir.1998).

### VI. Conclusion and Order

For the reasons stated, it is ORDERED that the Defendants, First Citizens' Federal Credit Union, Barbara Silva and Lisa Grace's Motion For Summary Judgment (# 26) be, and the same hereby is, ALLOWED as to Count IV. All other claims contained in the Complaint arise under state law. Since the Court declines to assert jurisdiction over them, they shall be DISMISSED.