**John Thomas CRUZ, Plaintiff,**

v.

**McALLISTER BROTHERS, INC., Defendant.**

**No. Civ. 97–2782(HL).**

United States District Court, D. Puerto Rico.

May 17, 1999.

---

272

Enrique J. Mendoza–Mendez, Mendoza & Baco, San Juan, PR, Roberto Schmidt–Monge, Hato Rey, PR, for John Thomas, plaintiff.

Jose Luis Suarez–Villafane, Jimenez, Graffam & Lausell, San Juan, PR, for McAllister Brothers, Inc., defendant.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

Before the Court are a motion for summary judgment by Defendant McAllister Brothers, Inc. and a motion for partial summary judgment by Plaintiff John Thomas Cruz ("Thomas"). McAllister operates a fleet of tugboats in Puerto Rico. Thomas is a former employee. He brings this claim for monetary and injunctive relief pursuant to the Americans with Disabilities Act[1] ("ADA") and the Fair Labor Standards Act[2] ("FLSA"). Thomas also brings Puerto Rico law claims pursuant to the Court's supplemental jurisdiction.[3]

McAllister's motion seeks summary judgment dismissing the entire case; Thomas' motion is limited to his FLSA claim. When parties file cross-motions for summary judgment, the court should consider each motion separately and draw inferences against each movant in turn. *Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 2 (1st Cir.1998). The Court will first consider McAllister's motion. Accordingly, the Court initially reviews the record in the light most favorable to Thomas and draws all reasonable inferences in his favor. *See LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993). Thomas began working for McAllister in March 1995 as a port engineer.[4] The exact nature of his duties in this position are at the crux of this dispute, and the Court discusses this issue more fully below. For now, it is sufficient to say that the job description states that a port engineer is responsible for maintaining McAllister's fleet in a seaworthy condition and that the position's duties include supervising engine maintenance personnel; supervising the operation of power plants and auxiliary equipment for the vessels; supervising the repair of vessels; approving requisitions for parts and supplies; administering the repair shop; and issuing work orders.[5]

In September 1996, Thomas was involved in a car accident unrelated to his work with McAllister. As a result of this accident he suffered injuries to his back, neck, and shoulders.[6] Thomas subsequently brought suit in Puerto Rico's local court against the driver of the other vehicle.[7] In his complaint in that suit he alleged that he lost his job at McAllister because he was unable to perform the work he had previously done.[8] In the

1. 42 U.S.C.A. §§ 12101 – 12213 (West 1995 & Supp.1999).

2. 29 U.S.C.A. §§ 201 – 219 (West 1998).

3. 28 U.S.C.A. § 1367 (West 1993).

4. Docket no. 46, exhibit 2.

5. Docket no. 46, exhibit 3.

6. Docket no. 1, at 2.

7. Docket no. 40, exhibit 20; docket no. 45.

8. Docket no. 40, exhibit 20; docket no. 45.

pretrial order for this local court case, Thomas modified this allegation to state that as a consequence of the accident he lost his job because McAllister did not want to provide accommodations for his health condition.[9]

Thomas' FLSA claim revolves around deductions that McAllister made to his accrued sick and vacation leave time. The first deduction was for the day of March 21, 1997. Eladio Rodríguez, Thomas' supervisor, claims that on that afternoon Thomas left work early and no one knew where he was.[10] Thomas disputes this version and avers that when he left for the afternoon he advised both the company's secretary and dispatcher.[11] It is undisputed that McAllister originally docked Thomas a half-day's pay for this absence.[12] He complained, and in his next paycheck McAllister paid him for this docked amount. The company did, however, deduct a half a day from his vacation leave.[13] McAllister made other partial day deductions from Thomas' leave banks for other of his absences in April 1997.

A key aspect of Thomas' ADA claim is his job performance on April 5, 1997. He claims that on that morning the tug *Rosemary* reported a problem with its winch; that the dispatcher called Thomas, and he went to the vessel to direct the repair; and that after it was repaired he went home.[14] He further claims that in the afternoon of that same day, he received a second call; that this time a cable had been caught in the propeller of the tugboat *Puerto Nuevo*; and that he called a scuba diver and went to the pier where the tug was located.[15] Rodríguez casts these events in a different light: in his depositions he stated that Thomas did not repair the *Rosemary* because he could not find a welder and that he negligently left the *Puerto Nuevo* unattended.[16] Regardless of the exact manner in which Thomas handled these two situations, it is undisputed that Rodríguez was not satisfied with his performance.[17] Rodríguez, who was not in Puerto Rico on this date, telephoned Thomas to discuss the way he had dealt with the two problems. Rodríguez was extremely angry and he told Thomas that he did not "need" him.[18] During this phone conversation, Thomas informed Rodríguez that he had taken medication, although he did not specify what kind of medication.[19] The medicine that Thomas had taken was Soma, which he took for pain caused by the automobile accident.[20]

The following Monday, April 7, 1997, Rodríguez met with Thomas to tell him that he was being demoted to assistant port engineer because he had performed his job negligently on April 5.[21] Thomas told Rodríguez that before he could accept this new position, he needed to know what his duties would be because he was looking for a reasonable accommodation.[22] The demotion involved a salary reduction, and Rodríguez told him to think about this

9. Docket no. 46, exhibit 38.

10. Docket no. 40, exhibit 60, at 132–33.

11. Docket no. 46, exhibit 11.

12. Docket no. 38, exhibit 2; docket no. 40, exhibit 60, at 133.

13. Docket no. 38, exhibit 2; docket no. 40, exhibit 60, at 133; docket no. 46, exhibit 1, at 230.

14. Docket no. 46, exhibit 1, at 242–44.

15. Docket no. 46, exhibit 1, at 244–45, 247.

16. Docket no. 40, exhibit 55A, at 57–63; docket no. 52, exhibit A, at 24, 26–27.

17. Docket no. 46, exhibit 20, at 62.

18. Docket no. 46, exhibit 1, at 247.

19. Docket no. 46, exhibit 1, at 247; docket no. 49, exhibit 12, at 248.

20. Docket no. 40, exhibit 35, at 250–51; docket no. 46, exhibit 13, at 70–71.

21. Docket no. 46, exhibit 1, at 205–06, 211, 255.

22. Docket no. 46, exhibit 1, at 264–65.

reduction and talk to him later about it.[23] Also, Rodríguez asked Thomas during the meeting if he could change a vessel's "power pack." Because changing a power pack requires physical exertion, Thomas mentioned that he would need a reasonable accommodation.[24] Thomas informed Rodríguez that he needed a job which did not require physical force.[25]

The next day, April 8, Thomas reported to work at 6:00 a.m. He felt ill that day, and he left approximately an hour later. He did return later that morning because Rodríguez had asked him to be present for an obligatory conference.[26] After the conference Rodríguez asked Thomas whether he had thought about what his salary should be as assistant port engineer. Thomas responded that he needed to know what the duties of the position entailed before he could discuss salary.[27] Thomas left after the conference. He did not work the rest of that week, and he was on sick leave from April 9 through April 11.[28]

The following Monday, April 14, Thomas returned to work with a letter from Dr. Mercedes Stefani, his physiatrist. Her letter stated that Thomas had been unable to work from April 8 through April 11 because he had been diagnosed as having cervical radiculopathy, degenerative disc disease, bilateral carpal tunnel syndrome, severe cervical myositis, and tendinitis in his shoulders.[29] On that same date Thomas also submitted a letter to his employer in which he stated that, pursuant to his doctor's recommendations, he requested a position which did not require "considera-

ble physical exertion in heavy lifting or carrying; climbing up and down ladders on the ships tanks and drydocks or the repair of equipment with respect to hull and machinery."[30] He attached a medical certificate from Dr. Stefani in which she repeated her diagnosis of Thomas and recommended that he not "perform activities requiring heavy lifting or carrying, continuous neck movement, elevation of arms shoulder level frequently [sic], frequent handling of objects or grasping."[31]

On April 16, Rodríguez decided that Thomas was unfit to perform his duties, and he ordered that he be placed on sick leave.[32] Thomas reported to work on that day, but Rodríguez asked or told him to leave. Thomas refused to leave, and Rodríguez called the police. When two officers arrived, Rodríguez asked them to remove Thomas because he constituted a safety threat.[33] The police determined that this was an employer—employee dispute and departed without removing Thomas from the premises. A few minutes after the police left, Thomas left of his own volition.[34] Thereafter, Thomas did not work at McAllister. He was on leave until his accrued vacation and sick time ran out.[35]

While Thomas was on leave, the following communications between the parties took place:

1 Letter from Thomas to Rodríguez dated May 5, 1997. Thomas protested the fact that he had been placed on sick leave, requested a written notice confirming that this action had

---

23. Docket no. 46, exhibit 1, at 264.

24. Docket no. 46, exhibit 1, at 260–61, 263–65.

25. Docket no. 46, exhibit 1, at 261, 264–65.

26. Docket no. 46, exhibit 1, at 280–81.

27. Docket no. 46, exhibit 1, at 282.

28. Docket no. 38, exhibit 2; docket no. 40, exhibit A, at 71–73.

29. Docket no. 40, exhibit 2.

30. Docket no. 46, exhibit 30.

31. Docket no. 46, exhibit 12.

32. Docket no. 46, Statement of Facts, at 29.

33. Docket no. 46, exhibit 1, at 396–98.

34. Docket no. 46, exhibit 1, at 398; exhibit 33.

35. Docket no. 46, exhibit 1, at 406–07.

been taken, and requested medical leave once his sick leave expired.[36]

2 Letter from Rodríguez to Thomas dated May 15, 1997. Rodríguez stated that Thomas' medical certificate indicated that he was unable to perform the duties of assistant port engineer; that Thomas was not allowed to work for safety reasons until the company could evaluate the situation; and that he had been placed on medical leave. In response to Thomas' request for a position that did not require physical exertion, Rodríguez stated that the company needed additional information on his condition. Specifically, Rodríguez requested an evaluation from Dr. Stefani as to what functions of the assistant port engineer job Thomas could complete. He also asked Thomas to be evaluated by Dr. Orlando Fernández, an orthopedic surgeon. Rodríguez informed Thomas that once the company had this medical information, it would contact Thomas to discuss a possible reasonable accommodation.[37]

3 Letter from Thomas to Rodríguez dated May 16, 1997. He stated that he would report to Dr. Fernández for an evaluation and would submit his files from Dr. Stefani. He also protested being placed on sick leave, claimed that his demotion was unjustified, and asserted that he was physically able to work. He stated that the only accommodation he needed was that he not be required to do tasks which required physical effort and which were not necessary to his performance as a port engineer.[38]

4 Letter from Thomas to Rodríguez dated June 2, 1997, stating that he is able to work and requesting that his salary be reinstated.[39]

5 Letter from Rodríguez to Thomas dated June 3, 1997, explaining why he was placed on medical leave. In the letter Rodríguez also requested that Thomas provide Dr. Fernández with certified copies of his medical records and that he provide the company with Dr. Stefani's evaluation. Rodríguez stated that once the company had received all the requested medical information, it would discuss with Thomas the possibility of a reasonable accommodation. Rodríguez further stated that it was the company's position that the position of assistant port engineer required Thomas to perform the activities which Dr. Stefani had recommended that he not do.[40]

6 Letter of June 1997 from Thomas to Rodríguez. Thomas stated that Dr. Stefani had already provided the solicited information in her medical certificate mentioning what functions he should not perform. He also requested that he be informed what criteria were used to determine that he was unable to perform the basic functions of his job.[41]

7 Letter of June 23, 1997, from Rodríguez to Thomas. Rodríguez reaffirmed his position that an assistant port engineer was required to do the activities which Dr. Stefani had recommended he not do and that it would be unsafe to allow Thomas to work in that position. Rodríguez further stated that because of these concerns the company was seeking an evaluation from Dr. Fernández and that once they had received his evaluation they would discuss the

---

**36.** Docket no. 46, exhibit 32.

**37.** Docket no. 40, exhibit 5.

**38.** Docket no. 46, exhibit 35.

**39.** Docket no. 46, exhibit 36.

**40.** Docket no. 40, exhibit 10.

**41.** Docket no. 40, exhibit 8.

possibility of a reasonable accommodation.[42]

8   Letter of July 2, 1997, from Thomas to Rodríguez, authorizing the company to obtain his medical records and requesting that he be given an interim position while his condition was being evaluated.[43]

9   Letter of July 8, 1997, from Rodríguez to Thomas, informing him that the company did not have an opening commensurate with Thomas' preparation or experience.[44]

In a report dated September 3, 1997, Dr. Fernández assessed Thomas as having sustained multiple areas of trauma as a result of the car accident; recommended that Thomas should limit his lifting to objects up to 25 pounds and should avoid bending over frequently or doing heavy lifting; and found him to have a ten percent permanent impairment.[45] Rodríguez wrote Thomas to inform him that, based on Dr. Fernández' assessment, Thomas was unable to engage in the activities required of an assistant port engineer. In that same letter Rodríguez invited Thomas to discuss the possibility of a reasonable accommodation and to identify what kind of accommodation he would like.[46] In a written response, Thomas stated that he disagreed with the company's assessment; that he was able to perform the essential functions of his job; and that he accepted the invitation to discuss alternatives. He asked the company to provide him with proposed alternatives.[47] Rodríguez responded with a letter offering Thomas the position of dispatcher and again repeating that it was the company's position that Thomas was unable to perform the essential functions of an assistant port engi-

neer.[48] Thomas rejected the offer to work as a dispatcher because it would entail a reduction in salary.[49] Rodríguez responded with a letter repeating the company's position that Thomas could not be allowed to work as an assistant port engineer because of his medical condition and informing him that the dispatcher position was the only one available.[50] No further alternative employment positions were discussed, and Thomas was terminated on October 31, 1997.

Thomas filed an administrative claim with the Puerto Rico Anti–Discrimination Unit on May 12, 1997. In the claim, he alleged that he was denied reasonable accommodation and that he had been harassed and retaliated against.[51] In the action before this Court, Thomas alleges that McAllister violated the ADA in three ways: by unlawfully terminating him, by retaliating against him, and by failing to engage in an interactive process to determine whether a reasonable accommodation was possible. He also claims that McAllister's deductions from his pay and leave hours constituted violations of the FLSA. In its motion for summary judgment, McAllister argues that Thomas is not disabled as defined by the ADA, that he was unable to perform the essential functions of an assistant port engineer, that it complied with its duty to engage in an interactive process with Thomas, and that it took no retaliatory measures against him. McAllister also argues that the deductions it made to Thomas' leave time do not subject it to liability under the FLSA. Thomas has opposed McAllister's motion for summary judgment. For the reasons set forth below, the Court grants in part

42.  Docket no. 46, exhibit 37.

43.  Docket no. 40, exhibit 11.

44.  Docket no. 40, exhibit 12.

45.  Docket no. 40, exhibit 14.

46.  Docket no. 40, exhibit 15.

47.  Docket no. 40, exhibit 16.

48.  Docket no. 40, exhibit 17.

49.  Docket no. 40, exhibits 18 & 42, at 414.

50.  Docket no. 40, exhibit 19.

51.  Docket no. 40, exhibit 53.

and denies in part McAllister's motion. It also denies Thomas' motion for partial summary judgment.

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting any facts that demonstrate a genuine issue for trial. Fed.R.Civ.P. 56(e); *LeBlanc,* 6 F.3d at 841. The nonmovant must do more than show "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue is genuine when, based on the evidence, a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512.

### 1. The ADA Claims

#### A. The claim of unlawful termination

Thomas alleges that McAllister's termination of him without providing reasonable accommodation violated the ADA. In the present case, there is little, if any, disagreement between the parties as to Thomas' physical condition. Dr. Stefani, his treating physician, recommended that he not engage in heavy lifting or carrying; that he not make continuous neck movements; and that he refrain from frequently raising his arms above shoulder-level and frequently grasping or handling objects.[52] At her deposition the physician clarified that although Thomas was able to crawl, climb, raise his arms, and grasp objects, he should not do these activities on a frequent, daily basis.[53] He could not lift more than twenty-five pounds.[54] She diagnosed him as having an eleven percent permanent impairment.[55] Dr. Fernández, the physician to whom McAllister referred Thomas, recommended that he avoid lifting more than twenty-five pounds and bending over frequently. He assessed him as having a ten percent permanent impairment.[56] This physician testified that heavy lifting, heavy use of his hands, or straining his neck would cause Thomas discomfort and that in general he should not do heavy physical work.[57] The two diagnoses reach similar conclusions on Thomas' condition. Neither party disputes the veracity of either physician's diagnosis. What is in dispute is the legal ramification of this condition.

■ The ADA prohibits an employer from discriminating against a qualified individual with a disability because of that individual's disability. 42 U.S.C.A. § 12112(a) (West 1995); *Soto–Ocasio v. Federal Express Corp.,* 150 F.3d 14, 18 (1st Cir.1998). For a plaintiff to succeed on a claim of unlawful discrimination under the ADA, he must prove by a preponderance of the evidence all three of the following essential elements: (1) he was disabled, as defined by the ADA; (2) he was a qualified individual able to perform the essential functions of his job, with or with-

52. Docket no. 46, exhibit 12.

53. Docket no. 46, exhibit 13, at 33–34.

54. Docket no. 46, exhibit 13, at 43.

55. Docket no. 46, exhibit 13, at 40.

56. Docket no. 40, exhibit 14.

57. Docket no. 46, exhibit 25, at 7–8, 12, 37, 66.

out reasonable accommodation; and (3) he was discharged because of his disability. *Lessard v. Osram Sylvania, Inc.*, 175 F.3d 193, 196 (1st Cir.1999); *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 15 (1st Cir. 1999); *Tardie v. Rehabilitation Hosp. of Rhode Island*, 168 F.3d 538, 541 (1st Cir.1999). The plaintiff has the burden of proving all three of these elements. *Lessard*, 175 F.3d 193, 196–97. McAllister asserts that Thomas has failed to establish these first two elements.

As an initial matter, the Court must determine what standard should be used to view the evidence. In its motion McAllister argues that the Court should analyze Thomas' claim of unlawful termination under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Thomas disagrees, arguing that because McAllister's intent is not at issue, *McDonnell Douglas* should not be used. Docket no. 46, at 35. This framework may be used for ADA claims. *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 141 n. 2 (1st Cir.1997); *Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 511 (1st Cir. 1996). Indeed, the First Circuit has recently done so. *See Laurin v. Providence Hosp.*, 150 F.3d 52, 58–61 (1st Cir.1998); *Dichner v. Liberty Travel*, 141 F.3d 24, 29–31 (1st Cir.1998); *Champagne v. Servistar Corp.*, 138 F.3d 7, 12–13 (1st Cir. 1998).

In general, the *McDonnell Douglas* burden-shifting test is used when the plaintiff has alleged that the employer has a discriminatory animus and there is no direct evidence of such an animus. *See Hidalgo v. Overseas Condado Ins. Agencies, Inc.*, 120 F.3d 328, 332 (1st Cir.1997); *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 465 (1st Cir.1996); *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95–96 (1st Cir.1996). Where there is not an issue of a discriminatory intent, however, the *McDonnell Douglas* test is not necessary. *Cf. Theriault v. Flynn*, 162 F.3d 46, 55 (1st Cir.1998) (Lipez, J., Concurring) (In claim under Title II of ADA, burden shifting was unnecessary because it was not necessary to find a discriminatory intent). This Court is unaware of any First Circuit opinion that has explicitly laid out the parameters on when *McDonnell Douglas'* test is and is not appropriate in ADA cases. In a number of its recent ADA cases where the employer's intent was not at issue, the First Circuit has refrained from utilizing *McDonnell Douglas*. *See Tardie*, 168 F.3d at 541–42 (Only issue was whether plaintiff had a disability as defined by the ADA); *Feliciano v. Rhode Island*, 160 F.3d 780, 784–88 (1st Cir.1998) (Only element of ADA claim in dispute was whether plaintiff was able to perform the essential functions of her job with or without reasonable accommodation); *Soto–Ocasio*, 150 F.3d at 18–20 (same); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 14–16 (1st Cir. 1997) (Whether plaintiff had a disability). By contrast, in ADA cases where there was an allegation of a discriminatory animus, the burden-shifting framework was used. *See Laurin*, 150 F.3d at 58–61 (Whether employer had a discriminatory animus in maintaining that certain job functions were essential); *Dichner*, 141 F.3d at 29–33 (Whether employer's refusal to hire plaintiff was based on discrimination against her condition); *Champagne*, 138 F.3d at 12–13 (Whether employer's termination and alleged retaliation was motivated by a discriminatory animus). Other circuits have explained that where an ADA cause of action does not involve discriminatory animus, the *McDonnell Douglas* test may be unnecessary or inappropriate. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n. 3 (10th Cir.1997); *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283–84 (7th Cir. 1996) (In a claim for denial of a reasonable accommodation, burden-shifting test was unnecessary); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178–83 (6th Cir.1996) (When determinative issue is not the employer's intent but the employee's ability to perform with or without reason-

able accommodation, burden-shifting is unnecessary).

■ There certainly will be ADA cases where it will be a difficult question as to whether the employer's intent is a determinative issue and whether *McDonnell Douglas* should be used.[58] Thomas' claim that McAllister illegally terminated him is not one of them. McAllister's intent on this particular claim is not in dispute. It is McAllister's position that Thomas was physically unable to perform the essential functions of the assistant port engineer position. Thomas contends that he was able to perform them. The dispositive issue in this claim involves a determination of what exactly were the duties and obligations of an assistant port engineer and whether Thomas could do them. This claim does *not* require a determination of whether Thomas' supervisors at McAllister harbored a discriminatory animus towards him because of his physical condition. In arguing against the use of the *McDonnell Douglas* standard, Thomas avers that intent is not at issue. Docket no. 46, at 35. The Court agrees. At least with regard to Thomas' claim that his termination violated the ADA, it is unnecessary to use the *McDonnell Douglas* burden-shifting framework.

■ The Court thus will proceed to a straightforward analysis of whether there is a genuine issue as to the three essential elements of an ADA claim. The first element is that the plaintiff be disabled, as defined by the Act. *Quint*, 172 F.3d 1, 15; *Tardie*, 168 F.3d at 541. If a plaintiff cannot establish that he has a disability, he will not be protected by the ADA. *Arnold v. United Parcel Service, Inc.*, 136 F.3d 854, 858–59 (1st Cir.1998). The Act defines disability as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C.A. § 12102(2); *Lessard*, 175 F.3d 193, 195. Major life activities are those "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1998). An individual is substantially limited if he is "[u]nable to perform a major life activity that the average person in the general population can perform" or if he is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* § 1630.2(j)(1); *Soileau*, 105 F.3d at 15. A court determining whether an individual is substantially limited in a major life activity should consider the nature and severity of his impairment; the impairment's duration or expected duration; and the impairment's long-term or expected long-term impact. *Id.* § 1630.2(j)(2); *Quint*, 172 F.3d 1, 10.

■ In the present case, Thomas claims to be substantially limited in working, lifting, carrying, bending, grasping, and sleeping. Working is a major life activity. 29 C.F.R. § 1630.2(i); *Quint*, 172 F.3d 1, 10; *Tardie*, 168 F.3d at 542. The inability to perform a single, particular job does not constitute being substantially limited in the ability to work. 29 C.F.R. § 1630.2(j)(3)(i); *Lessard*, 175 F.3d 193, 196–97; *Quint*, 172 F.3d 1, 11; *Tardie*, 168

---

**58.** For example, in *Laurin* the plaintiff claimed that she was denied a reasonable accommodation. 150 F.3d at 56–58. The First Circuit analyzed her claim initially under the three basic essential elements of an ADA claim, outlined at page 14 above. *See id.* at 56–58. The court then applied the *McDonnell Douglas* standard. *Id.* at 58–59. It used the burden-shifting framework because it had to determine whether the employer had a discriminatory animus when it defined the essential functions of plaintiff's position and because there was no direct evidence of this animus. *Id.* at 58.

F.3d at 542; *see also Knapp v. Northwestern University*, 101 F.3d 473, 480–81 (7th Cir.1996) (Major life activity of working does not mean working at the specific job of one's choice); *Welsh v. City of Tulsa, Okla.*, 977 F.2d 1415, 1417–18 (10th Cir. 1992) (same). A person is substantially limited in the activity of working if he faces significant restrictions in his ability to perform "a class of jobs or a broad range of jobs in various classes as compared to the average person" having comparable training, skill, and ability. 29 C.F.R. § 1630.2(j)(3)(i); *Lessard*, 175 F.3d 193, 198; *Tardie*, 168 F.3d at 542.

In the present case, each party's physician agrees that Thomas is limited in his ability to lift objects over twenty-five pounds. Dr. Stefani recommended that he not be required to frequently raise his arms, handle, or grasp. Dr. Fernández felt that Thomas should avoid having to bend over frequently.[59] An individual's inability to lift heavy objects and to do repetitive manual tasks may translate across a wide range of physically demanding jobs. *Quint*, 172 F.3d 1, 12. Additionally, in some cases, lifting itself may be a major life activity. 29 C.F.R.App. to § 1630.2(i). In his deposition, Dr. Fernández testified that Thomas' condition would exclude him from a broad range of jobs.[60] A plaintiff's burden of showing that he is substantially limited in the major life activity of working is not particularly onerous. *Quint*, 172 F.3d 1, 12. In the present case, the reports and testimony of the two physicians regarding Thomas' physical limitations and what work he can do create a genuine issue of fact as to whether Thomas is disabled under the ADA.

59. Docket no. 46, exhibits 12 & 21.

60. Docket no. 46, exhibit 25, at 46–47.

61. At the time he was terminated, Thomas had just been demoted to assistant port engineer. However, he never worked at that position. In its motion for summary judgment, McAllister asserts that the duties of a port engineer and assistant port engineer were, for

The second element of an ADA claim requires a plaintiff to prove that he is able to perform the essential functions of his job, with or without a reasonable accommodation. *Tardie*, 168 F.3d at 541. Pivotal to the resolution of this case is the question of what exactly were Thomas' essential job functions and whether he could do them. McAllister argues that the position of assistant port engineer requires strenuous physical exertion and that therefore Thomas is unable to perform the position's essential functions. Thomas, disagrees, claiming that the position is a supervisory one that does not require such exertion and that his condition does not prevent him from doing the job. There is little, if any, controversy between the parties over Thomas' physical condition; the dispute centers around the exact nature of his duties as an assistant port engineer. The evaluation of the evidence on this issue is central to the resolution of this controversy.[61]

The employee has the burden of proving with competent evidence that he is able to perform all the essential functions of his position. *Laurin*, 150 F.3d at 59; *Amego*, 110 F.3d at 144. The evidence on which Thomas chiefly relies includes his own testimony, the position's job description, and the testimony of other people familiar with McAllister's operations. The job description portrays the position as one largely supervisory in nature and does not specify any duties requiring physical labor.[62] Thomas argues that the description itself is sufficient to show that physical exertion is not an essential part of the job. The functions listed in a position's job description are evidence of the job's essential functions. 42 U.S.C.A.

the most part, similar. Docket no. 40, at 29 n. 7. Thomas does not contest this assertion. Therefore, in determining what are the duties of an assistant port engineer, the Court will also consider evidence on the duties of a port engineer.

62. Docket no. 46, exhibits 3 & 23.

§ 12111(8). The contents of the description are not, however, dispositive of this issue. *See Laurin,* 150 F.3d at 59 n. 5; *Amego,* 110 F.3d at 148 n. 13. A court should also consider the employer's judgment as to whether a function is essential; the amount of time spent on the job doing the specific function; any consequence of not requiring the employee to perform the function; the terms of a collective bargaining agreement; and the experience of individuals who have previously done or are currently doing the same job. 29 C.F.R. § 1630.2(n)(3); *Amego,* 110 F.3d at 148 n. 13. This inquiry should not second guess the employer's business judgment regarding qualitative or quantitative standards. *Amego,* 110 F.3d at 147. The employer is entitled to substantial leeway in defining the essential functions of a position. *Champagne,* 138 F.3d at 14.

In the present case, Thomas has the burden to prove that the job description precludes physical labor as an essential function of an assistant port engineer. *See Laurin,* 150 F.3d at 59 n. 5. Merely presenting the verbatim contents of the description will not be sufficient. Thomas also presents his own deposition testimony from the present case. There he stated that "[t]he position of port engineer did not require that I exert physical effort" in any of the functions which he mentioned in his letter of April 14, 1997 and that the position did not require considerable physical exertion and heavy lifting or carrying.[63] He also testified that his work did not require him to use physical force and that tasks such as changing a power pack were not his responsibility.[64] Ordinarily, this testimony might be sufficient to conclude that a genuine issue of fact exists as to the functions of an assistant port engineer. When considered in the light of the record as a whole, however, such a conclusion is not so straightforward. In the case in local court, where Thomas is suing the driver of the vehicle with which he had the accident, his testimony paints a starkly different picture. The Court quotes that testimony at length:

Q .... Now, as part of your duties or responsibilities in McAllister Brothers as Port Engineer, right, what was it that you did, did you work more as a supervisor or did you also have to go down into the tugboat to repair it?

A It had to be repaired.

\*  \*  \*  \*  \*  \*

Q And the repairs in this period from January of '97 to October of '97, when you say large repairs what did these repairs of those tugboats consist of?

A Main propulsion machines.

Q Propulsion machines?

A Yes, that ... like saying the engine of a car.

Q It's like the motor of a car?

A More or less, the equivalent.

Q The electrical phase also?

A The electrical phase, generators, hydraulic things, propellers, hull.

Q And did you personally do repairs of this kind during this period?

A *Yes*

Q Of motor machines, electricity, hull ...

A *Yes.*

Q ... of all of that?

A *Yes.*

Q You personally?

A *Yes.*

Q But didn't you have employees?

A Yes, but the employees are not ... are not very skilled.

Q You are a person that prefers to do it yourself?

---

**63.** Docket no. 46, exhibit 1, at 404; docket no. 40, exhibit 3.

**64.** Docket no. 46, exhibit 1, at 264–65.

A *It is not that I would rather do it, it is not that I prefer to, it is my job.*

Q Precisely, sometimes one becomes jealous, sometimes one is jealous about one's things.

A No, it is not that, it is not that I am jealous. *There were things that I had to do myself* because it was I who had the knowledge and the experience.

Q Despite having these employees?

A Yes.

Q So, between January of 1997 to October of 1997, you performed repairs of motor machines, tugboat electrical systems, you repaired hulls, hulls too?

A Hulls, propellers.

Q Propellers?

A Yes.

\* \* \* \* \* \*

Q Example, in March, in April of '97, had you changed a power pack, or any part . . .

A In '97?

Q Yes, in '97, or any analogous heavy part?

A *Yes* . .

\* \* \* \* \* \*

Q At any time did you tell McAllister either in April or after April, "Look, I can do my functions as Port Engineer?"

A I told them, but they were not in agreement.

\* \* \* \* \* \*

Q As Port Engineer?

A Yes, as Port Engineer.

Q With all the duties and responsibilities?

A No, not with all the duties and responsibilities, because *I could not do the physical work.*

Q Like what things?

A Repair a turbine, a water pump, I could not do things like that.

Q You couldn't do them?

A *No, because my physical condition did not* . . . I was not in the conditions that I was before the accident.

\* \* \* \* \* \*

Q And why in the position, at McAllister Brothers, weren't you allowed to remain as Port Engineer in charge of supervision, in charge of substantial tasks such as employee supervision, inspecting ships, which is a matter of going up and down vessels; you can go up and down vessels?

A That is precisely my contention on that.

\* \* \* \* \* \*

Q What do they say?

A That I have to do other . . . that is, that they need a Port Engineer that can do these tasks, that I could normally do, that I could normally do.

Q And they say you can't?

A No, no, I normally could . . .

Q Hmmm.

A . . . but since *now I am not physically fit to do them,* well they no longer need me.

Q Therefore, they are correct?

[Counsel for both parties interject]

A *Yes they are correct.*

Q . . . the conclusion is that they are correct. That is, if they are telling you, "Look, I need a Port Engineer who in addition to a supervisory aspect, a technical aspect, will also do physical things."

A Yes, that is what they say . . .

Q And you say that you can do them, you do physical and technical.

A *No, I cannot do physical, not now.*

\* \* \* \* \* \*

Q Whoever, let's not talk about McAllister, leave McAllister aside. Among the eight or ten positions

you have mentioned, could there be positions of Port Engineer or Ship Surveyor or Marine Surveyor that would not require physical effort, strength?

A *No.*

Q  They all require physical effort?

A Well, I cannot say all because ... all that I know of.

Q  All those you know of, all those you know of would require physical effort?

A If it were ... if it were a ship repair, and I want to be specific in this, ship repairs here in Puerto Rico, with Puerto Rico's conditions, *yes.*[65]

In the statement of facts in his opposition to the motion for summary judgment, Thomas makes a perfunctory attempt to explain the contradictions between the above-quoted testimony in the local court case and his deposition testimony in the present case. He explains that while he testified in the local court deposition that he had done repairs on propulsion machinery, propellers, generators, hulls, and electrical systems, he never admitted that these tasks were essential functions of his job.[66] This explanation is faulty for two reasons. First, it is belied by the record. Thomas did in fact admit during his local court deposition that physical work was part of his job. When asked why he did physical work, he replied, "It is not that I would rather do it, it is not that I prefer to, it is my job.... There were things that I had to do myself because it was I who had the knowledge and the experience."[67] Second, Thomas fails to explain the numerous admissions in his local court testimony that he was physically unable to perform the duties of his job.

In the face of this contradictory testimony, the Court can reasonably draw either of two inferences, neither of which favors Thomas. One inference is that his testimony in the present case is an attempt by him to perpetuate a sham in order to avoid summary judgment. A party cannot establish a genuine issue of fact by contradicting his own earlier statements unless he provides a plausible explanation for the discrepancy. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 237 (7th Cir.1991). This rule is generally invoked when a party tries to produce an affidavit to shore up the admissions he made in an earlier deposition. *See Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4–5 (1st Cir.1994); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3rd Cir. 1991); *Mahan v. Boston Water and Sewer Comm'n,* 179 F.R.D. 49, 52–53 (D.Mass. 1998). It has also been applied to disregard a witness' deposition testimony which contradicted his earlier testimony at a child custody hearing, *Bank of Illinois v. Allied Signal Safety Restraint Systems,* 75 F.3d 1162, 1165–72 (7th Cir.1996), to disregard a witness' deposition testimony which contradicted her previous answers to interrogatories, *id.,* and to disregard a party's deposition testimony which contradicted her earlier deposition testimony in the same case, *Gray v. Ameritech Corp.,* 937 F.Supp. 762, 767–69 (N.D.Ill.1996).

In the present case, Thomas testified at his deposition in the present case that he did not have to exert himself physically as a port engineer. In his deposition for the local court case, however, he testified to exactly the opposite—that he did do physical labor, that it was part of his job to do so, and that every port engineer position that he knew of required physical labor.

---

**65.** Docket no. 40, exhibits 44, 46, 47, 48; docket no. 45 (emphasis added). The Court relied in part on the translation provided by McAllister. However, the translation contains errors, particularly grammatical ones. If McAllister intends to introduce this deposition at trial, it should first correct the errors in its translation.

**66.** Docket no. 46, Statement of Facts, at 3.

**67.** Docket no. 40, exhibit 44, at 66; docket no. 45.

The Court can conceive of no reason why the rule regarding subsequent contradictory statements should not be applied to Thomas' statements in his deposition for the present case. He was represented by counsel at his first deposition, and he has offered no acceptable explanation for the discrepancies in his testimony. The Court would thus be justified in inferring that his deposition testimony in the present case regarding an assistant port engineer's duties is a sham and should be disregarded. *See Colantuoni*, 44 F.3d at 5; *Mahan*, 179 F.R.D. at 53.

There is a second inference which the Court may draw from Thomas' testimony regarding his duties as a port engineer. In the local court case, he repeatedly admitted that at his job he engaged in heavy physical labor. In his deposition for the present case he stated that "[t]he position of port engineer did not require that I exert physical effort" in any of the functions which he mentioned in his letter of April 14, 1997 and that the position did not require considerable physical exertion and heavy lifting or carrying.[68] He further stated that his work did not require him to use physical force and that tasks such as changing a power pack were not his responsibility.[69] In these statements, Thomas does not say that he never had to do physical labor, only that functions requiring physical exertion were not part of the official duties of a port engineer. It could be that Thomas is drawing a distinction between what he *actually* did as a port engineer and what he *believed* he should have had to do as a port engineer. His own statements and the arguments of his counsel consistently reaffirm that he *believed* that a port engineer should not have to do physical labor. Docket no. 46, exhibit 1, at 205 ("the company was demanding things of me that were not part of my work"), 206 (changing a power pack "is not my job"), 261 ("my work is not changing

power packs. My work was to be a port engineer."), 264–65 ("I told him that I needed a job in which I didn't have to use physical force but I repeat again that my work did not require me to do so."), 303 ("I was forced to do work that did not require a port engineer."), 306 (stating that he was doing "union work"), 307–08, 321 (stating that he did electrical work even though "it was not part of my job"); exhibit 11 ("As a Port Engineer ... I was being required to do work that was not part of my job description."); docket no. 46, Statement of Facts, at 11 ("Thomas was being required to do work that was not part of his job description."), 14, 30 ("he was being force [sic] to do work that did not belong to him."). These statements also constitute an admission, either implicit or direct, that he *actually* did do physical work. This admission is consistent with the testimony of Rodríguez and of Siguro Ingebretzen, a retired McAllister port engineer. Both men stated that the position involved physical labor.[70] This admission is also consistent with Thomas' request for reasonable accommodation, which was, in effect, a request that he no longer have to do physical work. When his statements are read in this manner, there is no contradiction between his local court testimony and his testimony in the present case.

■ Thomas' statements could be interpreted to be saying that he *did* engage in physical labor, but that he *should* not have been required to do so. Thomas is thus commenting on what he believes should be the duties of a port engineer, not what the duties actually are. It is not the employee, however, who is entitled to decide what a job's essential functions should be. Rather, it is the employer's prerogative to define a job's duties, and the employer has substantial leeway in defining them. *Champagne*, 138 F.3d at 14. To support his argument of what an assistant port

---

**68.** Docket no. 46, exhibit 1, at 404; docket no. 40, exhibit 3.

**69.** Docket no. 46, exhibit 1, at 265.

**70.** Docket no. 40, exhibit 45B; docket no. 49, exhibit 6

engineer should have to do, Thomas invokes the position's job description. The contents of the description are not, however, the sole determining factor to consider on this issue. *See Laurin,* 150 F.3d at 59 n. 5; *Amego,* 110 F.3d at 148 n. 13. When Thomas' statements are read in this light, they constitute evidence solely of what, in his opinion, the physical requirements of the position of assistant port engineer should be. They thus are insufficient to establish that the essential functions of an assistant port engineer do not include physical labor. If anything, they establish the opposite, that the position does indeed require physical labor. Thus, whether the Court considers Thomas' deposition testimony in the present case to be an intended sham or to be his personal belief on what the position's duties should be, they do not create a genuine issue of fact as to the essential functions of an assistant port engineer.

In order to avoid summary judgment on this issue, Thomas adduces the testimony of other individuals regarding the essential functions of an assistant port engineer. One such individual is Luis Ramirez, a representative for the union of master mates and pilots. As a representative, Ramirez had occasion to visit the McAllister shipyard on almost a daily basis. He testified that when he was a McAllister employee in the 1970s, Siguro Ingebretzen was the port engineer; that he never saw Ingebretzen do hands-on repair work; and that he has seen Thomas do supervisory work.[71] Ramirez did not testify, however, that an assistant port engineer was not required to engage in physical labor, and nothing in his testimony creates a genuine issue of fact on this point. Thomas also

proffers the testimony of Ingebretzen, who stated that when he was a port engineer for McAllister, he supervised the personnel who worked on the maintenance and repair of the tugboats.[72] The fact that his position was supervisory is not, by itself, sufficient to establish that it did not also require physical labor. In fact, Ingebretzen further testified that he did the same mechanical work as the other maintenance workers.[73] Ingebretzen's testimony is also insufficient to create a genuine issue of fact.

▪ Finally, Thomas adduces the testimony of José Colón, McAllister's current port engineer. In his deposition Colón stated that a port engineer needed to know mechanics, but he did not have to be a mechanic. Furthermore, when asked to describe a typical work day, he listed his supervisory and administrative duties, but he did not mention any physical tasks.[74] This testimony gives the Court pause. Colón's failure to include physical work as part of a normal work day and his statement that a port engineer does not have to be a mechanic are sufficient to create an inference that the position does not require physical exertion.[75] It is only on the basis of this testimony that the Court concludes that there is a genuine issue as to the essential functions of an assistant port engineer.

The Court recognizes that it may seem anomalous that Colón's comments create an issue of fact in the face of the extensive evidence—including Thomas' own testimony—to the contrary. In ruling on the motion for summary judgment, however, the Court must review the evidence in the light most favorable to Thomas and draw

71. Docket no. 46, exhibit 8.

72. Docket no. 46, exhibit 5.

73. Docket no. 49, exhibit 6.

74. Docket no. 46, exhibit 4.

75. McAllister has submitted an affidavit by Colón in which he states that a port engineer is required to perform mechanical work.

Docket no. 40, exhibit 45A. McAllister has made no attempt, however, to explain the apparent contradiction between Colón's affidavit and his deposition testimony. Thus, the affidavit testimony may not correct the inference created by his deposition testimony. *Cf. Colantuoni,* 44 F.3d at 4–5.

all reasonable inferences in his favor. *See LeBlanc,* 6 F.3d at 841. Under this rubric, the Court must view in a light favorable to Thomas the conflicting testimony regarding the duties of an assistant port engineer. Based on Colón's deposition testimony, a factfinder could infer that the job does not require physical exertion. Accordingly, there are genuine issues of fact as to whether Thomas is disabled and as to whether he is able to do the essential functions of his position. Thus, the motion for summary judgment on this claim must be denied.

### B. The retaliation claim

■ Thomas also claims that he was the victim of retaliation. Specifically, he claims that his demotion, the deductions from his sick and vacation leave accrued time, and his termination were all unlawful retaliations. Unlike the claim discussed in the preceding section, in the retaliation claim McAllister's intent does come into play. Thomas is alleging that the adverse actions that McAllister took against him were motivated by a retaliatory animus. Thus, the employer's motive is at issue here. There is no direct evidence of this alleged motive, and Thomas must rely on circumstantial evidence to support this claim. When, in a claim of retaliation, there is no direct evidence of an improper motive, the record should be analyzed with the *McDonnell Douglas* burden-shifting test. *See McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 309 (1st Cir.1998). In reviewing an ADA retaliation claim, a court may find guidance in Title VII retaliation claims. *Soileau,* 105 F.3d at 16.

To make out a *prima facie* retaliation claim, a plaintiff must show that he engaged in protected conduct, that he was subject to an adverse employment action, and that there was a causal connection between the adverse action and his protected conduct. *Champagne,* 138 F.3d at 12 n. 5; *Soileau,* 105 F.3d at 16. Once the plaintiff meets his burden at this stage, the employer has the burden of production to articulate a legitimate, non-retaliatory reason for the employment action. *Provencher v. CVS Pharmacy,* 145 F.3d 5, 10 (1st Cir.1998); *McMillan,* 140 F.3d at 309. The burden then shifts back to the plaintiff who must show by a preponderance of the evidence that the proffered reason is merely a pretext and that the real reason was the employer's retaliatory animus. *McMillan,* 140 F.3d at 309; *Champagne,* 138 F.3d at 12–13.

■ As part of a retaliation claim, a plaintiff must show a causal relationship between his protected activity and the adverse employment action. This showing requires more than mere conjecture and unsupported allegations. *DeNovellis v. Shalala,* 135 F.3d 58, 65 (1st Cir.1998). The plaintiff must demonstrate the existence of specific facts to enable the factfinder to infer that the employer's proffered reasons were mere pretext for a retaliatory motive. *Id.; Randlett v. Shalala,* 118 F.3d 857, 862–63 (1st Cir.1997). The employer must have taken the adverse action for the purpose of retaliating against the plaintiff. *Randlett,* 118 F.3d at 862. Close temporal proximity between protected conduct and an adverse employment action may give rise to a permissible inference of retaliation. *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 168 (1st Cir.1998). Such evidence, however, is not conclusive. *Id.* at 170. A court should consider the actions taken against the employee within the overall context and sequence of events. *Champagne,* 138 F.3d at 13; *Soileau,* 105 F.3d at 16–17. Other factors that a court should examine include the historical background of the decision, any departures from normal procedure, and contemporary statements by the employer's decision makers. *Hodgens,* 144 F.3d at 168–69.

In the present case Thomas claims that his protected conduct included a request on an unspecified date after his accident that additional personnel be hired to help him with the physical work that he was

doing; his statement to Rodríguez on April 5, 1997, that he was taking medication; his written request of April 14, 1997, that he be given a position which did not require physical exertion; and his filing of a claim with the Puerto Rico Anti–Discrimination Unit on May 12, 1997. He claims that the retaliation he suffered was his demotion on April 7, 1997, to assistant port engineer; his being placed on leave after April 15, 1997; McAllister's calling the police when Thomas showed up for work on April 16, 1997; and his termination in October 1997.

▮ With regard to his alleged protected conduct of telling Rodríguez about his medication, Thomas claims that the retaliation he suffered was his demotion. It is unlawful for an employer to discriminate against an employee because he has opposed any practice made unlawful by the ADA or because the employee has made a charge or participated in any proceeding under the ADA. 42 U.S.C.A. § 12203. A literal reading of the statute does not include a request for a reasonable accommodation as protected conduct. Nevertheless, the First Circuit has assumed that such a request constitutes protected conduct. *See Soileau,* 105 F.3d at 16; *see also Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir.1999) (treating a request for reasonable accommodation as protected conduct); *Barker v. Int'l Paper Co.,* 993 F.Supp. 10, 16 (D.Me.1998) (same). The Court will make a similar assumption. Thomas' statement to Rodríguez that he was taking medication, however, was just that—a statement that he was taking medicine. He did not specify what kind of medication he was taking, and there is no evidence that he asked for an accommodation because he was taking it.[76] This simple statement by itself cannot constitute a request for a reasonable accommodation. Therefore, Thomas did not en-

gage in any protected conduct on April 5, and his resulting demotion on April 7 cannot be an unlawful retaliation.

Even if the Court were to assume that his statement to Rodríguez did constitute protected conduct, his retaliation claim would fail. There is evidence that Thomas was demoted because Rodríguez found his performance on April 5 to be negligent.[77] This evidence satisfies McAllister's burden of articulating a legitimate reason for its actions. In response, Thomas has adduced evidence to contest McAllister's contention that Thomas performed negligently on April 5.[78] This evidence creates an issue of fact, however, only as to whether Thomas' performance was deficient. Thomas proffers no evidence that the demotion was motivated by a retaliatory animus against him because he had engaged in protected conduct.

▮ Thomas' remaining retaliation claims are similarly defective. After he requested a reasonable accommodation on April 14, 1997, Thomas was placed on leave and prevented from working. On May 12, 1997, he filed his claim with the Puerto Rico Anti–Discrimination Unit. In October he was terminated. Because of the temporal proximity between his protected acts and the adverse actions, a suggestion of a link between them is created. McAllister then has the burden of producing a legitimate nonretaliatory reason for its actions. It is McAllister's position that once Thomas stated that he could not engage in physical labor, he was unable to perform the duties of an assistant port engineer. There is ample evidence—including Thomas' own testimony—that this was in fact the case. McAllister further claims that it therefore placed Thomas on leave until it could resolve the question of what jobs, if any, he could perform. The record indicates that McAllister's treatment of Thom-

---

**76.** Docket no. 46, exhibit 1, at 247; docket no. 49, exhibit 12, at 248.

**77.** Docket no. 40, exhibit 55A; docket no. 46, exhibit 1, at 211, 255.

**78.** Docket no. 46, exhibit 1, at 205, 211, 242–45, 247.

as was consistent with this legitimate, non-retaliatory motive.

The burden then shifts to Thomas to adduce evidence that McAllister's proffered reason was merely pretextual and that its real reason was to retaliate against him. *See McMillan,* 140 F.3d at 309. As discussed in the previous section, there is some evidence that the essential functions of an assistant port engineer do not require physical exertion and that therefore Thomas is able to do his job. Thus, there is a genuine issue of fact as to McAllister's proffered reason for placing Thomas on leave and subsequently terminating him.

Thomas must also adduce evidence that McAllister's real motive for its actions was a retaliatory one. This he has failed to do. There is some temporal proximity between his protected conduct and the adverse employment actions. By itself, this evidence is insufficient. Rather than focusing solely on the timing of the events, the Court must look at the "larger picture." *See Soileau,* 105 F.3d at 16. When McAllister's actions are viewed in this manner, the impact of any temporal proximity fades away. McAllister contends that Thomas was unable to perform the physical duties required of an assistant port engineer, and there is evidence to support this contention. McAllister further contends that it therefore chose to have Thomas stop working until this situation could be resolved. There is also evidence to support this contention. The record as a whole indicates that McAllister's motive for taking these actions was consistent with its position that Thomas was unable to do his job. The record does not contain any evidence—other than the timing of the events—that McAllister's real motivation for its actions were to retaliate against Thomas. Thus, this claim must fail.

It is important to distinguish between the retaliation claim and the unlawful termination claim. Although the two claims are based on the same general set of facts, the success of one does not require the success of the other. *Cf. Soileau,* 105 F.3d at 16 (A plaintiff may assert a claim of retaliation for requesting an accommodation even though the underlying claim of disability fails). With regard to the claim of unlawful termination, it may be that at trial the jury disagrees with McAllister and determines that an assistant port engineer is not required to engage in physical labor and that thus Thomas could perform all the essential functions of his position. This determination will have no bearing on the issue in the retaliation claim: whether McAllister's motive for placing Thomas on leave and subsequently firing him was to get back at him for requesting reasonable accommodation or for filing an administrative complaint. Although the two causes of action arise out of the same circumstances, they require different showings and are thus not so interrelated that if one survives a motion for summary judgment, the other one must survive as well.

## C. The interactive process claim

Thomas also claims that McAllister is liable because it violated its duty to engage in an interactive process. Employers are encouraged to engage in an informal interactive process with an employee with a disability who requests a reasonable accommodation. *Lessard,* 175 F.3d 193, 199; *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 677 (1st Cir.1995); 29 C.F.R. § 1630.2(*o*)(3) & App. to § 1630.9. There may be situations in which an employer's failure to engage in this process will constitute a failure to provide a reasonable accommodation in violation of the ADA. *Soto–Ocasio,* 150 F.3d at 19; *Jacques,* 96 F.3d at 515. The present case is not such a situation. The record is replete with evidence that the two sides maintained a steady communication regarding Thomas' physical condition and how he might be accommodated. Thomas may not be satisfied with the position that McAllister adopted during this process, but a claim by him that McAllister failed to participate in the interactive process is disingenuous and has no support in the record.

Thomas makes much of the fact that Rodríguez ordered that Thomas be placed on leave without first consulting personally with Dr. Fernández. This argument overlooks the fact that Thomas himself provided McAllister on April 14, 1997, with an evaluation from Dr. Stefani stating that he could not physically exert himself on the job. Thus, by the time Thomas was placed on leave, McAllister had already received objective medical evidence that he could not engage in the physical tasks which McAllister contends are essential to the position of assistant port engineer. The refusal to allow him back to work without first communicating with Dr. Fernández was not a violation of any duty to engage in the interactive process. *Cf. Knapp,* 101 F.3d at 484–85 (School was justified in preventing athlete with heart condition from playing basketball because its reliance on medical evidence regarding risk was made with reason and rationality). Therefore, the Court hereby dismisses Thomas' claim of an alleged failure to participate in an interactive process.

### 2. The Fair Labor Standards Act claim

In his FLSA claim, Thomas claims that he was subjected to deductions from his accrued sick and vacation leave time when he took partial-day absences; that McAllister treated him as an exempt employee under the FLSA; and that he was not paid for the overtime hours that he worked. He further claims that because of these deductions from his leave time, McAllister lost the benefit of treating him as an exempt employee and he is therefore entitled to have his overtime hours compensated accordingly.[79] McAllister does not deny that it deducted from Thomas' sick and vacation leave for partial-day absences, but it does argue that these deductions did not remove Thomas from the ranks of exempt employees.

The FLSA establishes that, as a general rule, an employee must be compensated at a rate of at least one and one-half times his

79. Docket no. 1, paragraphs 26, 27, 52, & L.

regular rate for all overtime hours. 29 U.S.C.A. § 207(a)(1) (West 1998); *Reich v. John Alden Life Ins.,* 126 F.3d 1, 7 (1st Cir.1997). There is an exception to this rule for employees working "in a bona fide executive, administrative, or professional capacity." 29 U.S.C.A. § 213(a)(1); *Reich,* 126 F.3d at 7. This exception is defined in the regulations. *See* 29 C.F.R. §§ 541.1— 541.3 (1998). One of the requirements for an employee to be included in this exception is that he be paid on a salary basis. *Id.* §§ 541.1(f), 541.2(e)(1), 541.3(e). Thomas argues that because of these deductions, he was not paid in this manner. An employee is considered to be paid on a salary basis

> if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work.

*Id.* § 541.118(a).

A majority of the courts that have considered this issue have held that a deduction from an employee's accrued leave time for partial-day absences does not affect the employee's status as being paid on a salary basis. *See Barner v. City of Novato,* 17 F.3d 1256, 1261–62 (9th Cir.1994); *York v. City of Wichita Falls, Tex.,* 944 F.2d 236, 242 (5th Cir.1991); *Caperci v. Rite Aid Corp.,* 43 F.Supp.2d 83, 92–93 (D.Mass. 1999) (surveying cases); *Aiken v. County of Hampton, S.C.,* 977 F.Supp. 390, 396–97 (D.S.C.1997) ("A reduction in paid leave time does not affect an employee's status

as a salaried employee."), *aff'd*, 172 F.3d 43 (4th Cir.1998) (Table case); *Yuen v. U.S. Asia Commercial Dev. Corp.*, 974 F.Supp. 515 (E.D.Va.1997); *Leslie v. Ingalls Shipbuilding, Inc.*, 899 F.Supp. 1578, 1581 (S.D.Miss.1995); *Kuchinskas v. Broward County*, 840 F.Supp. 1548, 1555 (S.D.Fla.1993), *aff'd*, 86 F.3d 1168 (11th Cir.1996) (Table case); *Int'l Ass'n of Fire Fighters v. City of Alexandria, Va.*, 720 F.Supp. 1230, 1232 (E.D.Va.1989), *aff'd* 912 F.2d 463 (4th Cir.1990) (Table case); *see also Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1070 (7th Cir. 1997) ("Nothing in the regulations suggests that an employee loses his exempt status simply because his employer disciplines him in a non-monetary fashion for failing to work during his scheduled time."). Thomas relies on *Abshire v. County of Kern*, 908 F.2d 483 (9th Cir. 1990), for the proposition that leave deductions from partial-day absences do remove an employee from exempt status. In that case, the Ninth Circuit stated in a footnote that a "strong argument" could be made that such deductions would mean that an employee was not being paid on a salaried basis. *Id.* at 487 n. 3. The authority of that footnote was greatly diminished, however, by a subsequent Ninth Circuit opinion. In *Barner*, the court treated the footnote as dicta and affirmed a district court that had chosen to disregard it. 17 F.3d at 1261.

The Court is also aware of two district court cases that have held that the deduction of an employee's leave time for partial-day absences removes that employee from exempt status. *See Service Employees Int'l Union v. County of San Diego*, 784 F.Supp. 1503, 1510–11 (S.D.Cal.1992); *Thomas v. County of Fairfax, Va.*, 758 F.Supp. 353, 365–66 (E.D.Va.1991). The precedential weight of these two cases is at best dubious. The Ninth Circuit has expressly rejected the holding of *Service Employees. See Barner*, 17 F.3d at 1261 n. 7. And *Thomas* is in conflict with the

holding in *Int'l Ass'n of Fire Fighters*, 720 F.Supp. at 1232. The Fourth Circuit has, in an unpublished opinion, considered the two cases and chosen to follow the reasoning of *Int'l Ass'n. See Vogel v. American Home Products Corp.*, 122 F.3d 1065, 1997 WL 577578, at *5 (4th Cir.1997). Thus, there is little support from the case law for Thomas' position on his FLSA claim.

■ McAllister has also submitted an opinion letter from the Department of Labor dated April 15, 1994. In that letter the Department opines that leave bank deductions for partial-day absences may be made without destroying an employee's salaried status.[80] *See also Caperci*, 43 F.Supp.2d 83, 92 (Referring to two Department of Labor opinion letters reaching this same conclusion). This opinion should be controlling unless it is plainly erroneous or inconsistent with the regulations. *See Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997); *Boykin v. Boeing Co.*, 128 F.3d 1279, 1281 (9th Cir.1997); *see also Reich*, 126 F.3d at 8 (Interpretive regulations constitute a body of informed judgment to which courts may resort for guidance). Thomas does not argue that the Department's opinion letter suffers from such shortcomings. Accordingly, based on the weight of the case law and the Department of Labor's position on this subject, the Court joins the majority of courts and holds that deductions from leave banks for partial-day absences will not destroy an individual's status as a salaried employee. Therefore, McAllister's deductions from Thomas' leave banks do not prevent it from treating him as an exempt employee.

■ In his complaint Thomas only makes a claim for deductions from his sick and vacation leave for his partial-day absences. In his motion for partial summary judgment on this issue, he also complains that McAllister deducted from his pay for an alleged half-day absence on March 21, 1997. After Thomas complained about this

**80.** Docket no. 40, exhibit 63.

deduction, McAllister paid him for this docked amount in his next paycheck. McAllister then made a corresponding deduction to his accrued vacation leave. The relevant regulations state that an employee is paid on a salary basis only if he receives on a regular basis a fixed amount of pay which is not subject to deductions. 29 C.F.R. § 541.118(a). This rule prohibits employers from deducting an employee's pay because of partial-day absences. *DiGiore v. Ryan*, 172 F.3d 454, 461(7th Cir.1999). If a deduction from an employee's pay is inconsistent with the salary-basis test, the employer may not treat the employee as an exempt one. *Auer*, 519 U.S. at 463, 117 S.Ct. at 912. In the case of a one-time deduction in pay, however, an employer is afforded a "window of correction." The regulations provide that "where a deduction not permitted by [the regulations] is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future." 29 C.F.R. § 541.118(a)(6). Thus, when an employer properly corrects a one-time pay deduction, the exempt status may remain. *Auer*, 519 U.S. at 461–64, 117 S.Ct. at 911–12; *DiGiore*, 172 F.3d 454, 464; *Carpenter v. City & County of Denver, Colo.*, 115 F.3d 765, 767 (10th Cir.1997); *Arrington v. City of Macon*, 973 F.Supp. 1467, 1473–74 (M.D.Ga.1997).

In the case before the Court, once Thomas complained about this pay deduction, McAllister reimbursed him for the deducted amount in his next paycheck. There is no evidence that there were any other pay deductions. Thus, McAllister corrected its one-time error. In order for an employer to avail itself of the window of correction, the regulations also require that the employer promise to comply in the future with the rule against such pay deductions. 29 C.F.R. § 541.118(a)(6). Here, there is no evidence that McAllister has made such a promise. The Court finds that the lack of evidence on this promise should not preclude the entry of summary judgment on this issue for the following reasons. First, Thomas does not allege that McAllister failed to make such a promise; he only complains that McAllister's lack of compliance was its deduction of his pay. Second, in *Auer*, the Supreme Court noted that the regulations do not specify the time limits for an employer to take corrective action. *See* 519 U.S. at 463–64, 117 S.Ct. at 912. Thus, an employer may take the necessary remedial measures, including the promise to comply, *after* a lawsuit for lack of compliance has been initiated. *See id.*; *Arrington*, 973 F.Supp. at 1474. In *Auer*, the Supreme Court went so far as to allow the defendant employer to comply subsequent to its opinion. *See* 519 U.S. at 463–64, 117 S.Ct. at 912. In the present case, if Thomas were to win reinstatement at trial, McAllister could comply with the corrective provisions of the regulation by promising not to make future pay deductions from his salary. Accordingly, there is no genuine issue of material fact on Thomas' FLSA claim, and the Court grants summary judgment dismissing it. The Court thus also denies Thomas' motion for partial summary judgment on this same claim.

### 3. Puerto Rico law claims

Lastly, Thomas also brings a number of claims under Puerto Rico law, including the local provisions which are parallel to the ADA and FLSA. The assertion of supplemental jurisdiction over state law claims is within a federal court's discretion. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). If federal law claims are dismissed before trial, however, the state law claims should also be dismissed. *Id.* at 726, 86 S.Ct. at 1139; *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990); *Soto v. Carrasquillo*, 878 F.Supp. 324, 332 (D.P.R.1995), *aff'd sub nom. Soto v. Flores*, 103 F.3d 1056 (1st Cir.1997). Because the Court has dismissed Thomas' FLSA claims and his ADA claims on retal-

iation and the interactive process, the Court hereby dismisses without prejudice his Puerto Rico law claims for retaliation, failing to engage in the interactive process, and unpaid overtime. There remains in this case his claim for unlawful termination under the ADA and Puerto Rico Laws 44 and 80.

WHEREFORE, the Court grants in part and denies in part McAllister's motion for summary judgment (docket no. 40) and denies Thomas' motion for partial summary judgment (docket no. 38). Partial judgment shall be entered accordingly.

**IT IS SO ORDERED.**